709 So.2d 512 (1998)
Leo Alexander JONES, Appellant,
v.
STATE of Florida, Appellee.
No. 92234.
Supreme Court of Florida.
March 17, 1998.
*514 Martin J. McClain, Litigation Director, Office of the CCRCSouth, Miami, for Appellant.
Robert A. Butterworth, Attorney General, Richard B. Martell, Chief, Capital Appeals, and Curtis M. French, Assistant Attorney General, Tallahassee, for Appellee.
PER CURIAM.
Leo Alexander Jones, under sentence of death and warrant for execution, appeals the trial court's denial of his third motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See Art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the trial court's denial of Jones' 3.850 motion.

PROCEDURAL BACKGROUND
Jones was convicted of first-degree murder and sentenced to death in 1981. This Court affirmed the conviction and sentence on direct appeal. See Jones v. State, 440 So.2d 570 (Fla.1983). Since that time, Jones has made several unsuccessful attempts to obtain relief. Specifically, this Court denied Jones' first petition for writ of habeas corpus alleging ineffective assistance of appellate counsel, see Jones v. Wainwright, 473 So.2d 1244 (Fla.1985), and affirmed the denial of his first 3.850 motion alleging ineffective assistance of trial counsel. See Jones v. State, 528 So.2d 1171 (Fla.1988). This Court then denied his second petition for writ of habeas corpus, wherein Jones alleged several procedurally barred claims regarding the sentencing phase of his trial. See Jones v. Dugger, 533 So.2d 290 (Fla.1988). The Eleventh Circuit Court of Appeals also affirmed the denial of a habeas petition filed by Jones. See Jones v. Dugger, 928 F.2d 1020 (11th Cir.1991).
Jones filed a second 3.850 motion in 1991 based on a claim of newly discovered evidence. The trial court summarily denied this motion because the evidence alleged "would not have compelled a verdict for Jones" if it had been introduced at trial. Jones v. State, 591 So.2d 911, 915 (Fla.1991). However, on appeal this Court remanded the case for an evidentiary hearing after enunciating a less stringent standard that requires a new trial where the newly discovered evidence would "probably produce an acquittal on retrial." Id. Following an evidentiary hearing on remand, the trial court again denied Jones' 3.850 motion, and this Court affirmed. See Jones v. State, 678 So.2d 309 (Fla.1996), cert. denied, ___ U.S. ____, 117 S.Ct. 1088, 137 L.Ed.2d 221 (1997). Jones has since filed multiple "all-writs" petitions,[1] as well as petitions for writs of prohibition and mandamus.
In his most recent 3.850 motion, Jones alleged that newly discovered evidence established his innocence and that he was denied due process because he was tried, convicted, and sentenced to death by a judge who violated the Code of Judicial Conduct. Jones orally amended his motion at the evidentiary hearing to include a claim that the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Due to Jones' allegations of misconduct by the presiding judge, this Court appointed Senior Circuit Judge Clarence Johnson to conduct the 3.850 evidentiary proceedings.
After a four-day evidentiary hearing, Judge Johnson denied Jones' motion for a new trial, finding the evidence presented would not probably produce an acquittal on retrial. Jones now appeals that decision.
In reviewing the trial court's decision, we are mindful that "this Court, as an appellate body, has no authority to substitute its view of the facts for that of the trial judge when competent evidence exists to support *515 the trial judge's conclusion." State v. Spaziano, 692 So.2d 174, 175, 177 (Fla.1997); see also Blanco v. State, 702 So.2d 1250 (Fla. 1997). A trial court's order on a motion for new trial will not be reversed absent an abuse of discretion. Spaziano, 692 So.2d at 178.

FACTUAL BACKGROUND
The basic facts of the underlying crime are detailed in this Court's original opinion affirming Jones' conviction and sentence:
[O]n May 23, 1981, shortly after 1:00 A.M., Officer Thomas J. Szafranski was shot in his squad car at the intersection of 6th Street and Davis Street, Jacksonville, Florida. Officer Wilmouth was first on the scene. While Wilmouth waited for medical assistance to arrive a group of people came out of a nearby bar and approached him. One unidentified member of the group indicated that the shots had come from the two-story apartment building fronting the 6th and Davis Street intersection. Thereafter Wilmouth proceeded to investigate this building.
Officer Mundy had been informed of the incident by radio and quickly joined Wilmouth in the investigation. According to Mundy, the reputation of the apartment building in question was well travelled in law enforcement circles. Mundy entered the building fully aware that the vacant lower left apartment was a known "stash house" harboring drug users, vagabonds and other street criminals.
The two officers' search of the building's lower level produced nothing. However, Wilmouth informed Mundy that he had heard "shuffling" in the upper left apartment. Thereafter Mundy approached this apartment, knocked on the door, and proceeded to identify himself as a police officer. His repeated knocking, however, went unanswered. When Mundy continued to hear voices coming from within he entered the apartment; there he confronted appellant and appellant's cousin, Bobby Hammond[s], charging them both with attempted first-degree murder. During a cursory search of the apartment, assisting officers located several high-powered rifles, resting in plain view, but did not, at that time, disturb them.
Both appellant and Hammond[s] were then transported to the Police Memorial Building. There, after being given repeated Miranda warnings by Officer Eason, appellant signed [the following] statement incriminating himself and exonerating his cousin, Hammond[s]....
I, Leo Jones have been given my rights and I fully understand them and am making this statement on my own free will. I have given Det. Eason permission to write this statement for me. I, Leo Jones on 23 May 81 took a rifle out of the front room of my apartment and went down the back stairs and walked to the front empty apartment and shot the policeman through the front window of the apartment. I then ran back upstairs and hid the gun or rifle and then the police came.
Jones v. State, 440 So.2d at 572-73.
In a later opinion, we elaborated on Jones' confession:
Prior to trial, Jones moved to suppress his confession. He and Hammond[s] testified that the police beat them both at the scene and at the police station. The police acknowledged striking them at the scene but testified that it was necessary to do so because they were resisting arrest. The police denied hitting them at any other time. Prior to obtaining Jones' short two-sentence confession, they took him to the hospital. The attending doctor testified that Jones had only superficial injuries. The trial judge refused to suppress the confession, and this ruling was ultimately approved on direct appeal.[[2]]
At trial, the State relied heavily upon the confession. However, there was also testimony that about a week prior to the murder Jones had told a police officer that he was tired of being hassled by the police *516 and that he intended to kill a pig. Further, Hammond[s] testified that on the night of the murder, he saw Jones leave the apartment with a rifle in his hand. Hammond[s] then heard gunshots and shortly thereafter Jones returned to the apartment still carrying the rifle. This testimony was consistent with the State's theory that Jones had fired the shots from a downstairs apartment. However, Hammond[s] was impeached by an earlier sworn statement to the effect that he did not see Jones with a gun that night.[[3]]
Jones, 591 So.2d at 912-13.
In our opinion affirming the trial court's order denying Jones' previous 3.850 motion, we further observed that:
The record also reflects that Jones maintained his innocence at trial and testified that the rifles discovered in his apartment belonged to Glen Schofield, a friend who stayed in his apartment on occasion. Further, Hammonds testified that Schofield was at Jones' apartment the night of the shooting and that Schofield left the apartment armed with a handgun at approximately 12:15 a.m. The defense, however, did not present any additional evidence that might have linked Schofield to the murder. Moreover, Jones' trial attorney did not argue to the jury that Schofield might have committed the murder.
Jones, 678 So.2d at 311.
Because all of the evidence presented in Jones' original trial is important to our analysis of the issues Jones raises in the present 3.850 appeal, we set forth the following additional, pertinent facts from the record of the original trial. Officer Szafranski's car was the third in a series of police cars turning at the intersection of 6th and Davis Streets. The officers were returning from a nearby hostage situation. Officer Dyal, who was driving one of the two police cars immediately preceding Officer Szafranski's vehicle, testified that after he heard the first shot, he looked back and saw "flashes" from two more gunshots emanating from Jones' apartment building.
Expert testimony revealed that Officer Szafranski was shot with a .30-.30 calibre Winchester Marlin rifle. Two such rifles were found in Jones' apartment, each with one spent shell casing. Jones' fingerprint was found on the breach area of one of the rifles.
As to other evidence presented at trial, Officer Mundy testified that while searching the downstairs, vacant apartment in Jones' apartment building after the shooting, he found a fresh recoil mark on the sill of one of the windows. A ballistics expert testified that the bullet's trajectory was consistent with the bullet having been fired from the downstairs apartment. The expert further testified that the bullet entered the windshield of Officer Szafranski's car, around the area of the rearview mirror, traveling in an approximately horizontal plane. The physical evidence, the expert testimony concerning the trajectory of the bullet, Hammonds' trial testimony, and Jones' confessions were all consistent with the State's theory that Officer Szafranski was shot from the downstairs apartment.
Jones confessed orally to Officer Eason before signing the written confession. Officer Eason further testified that after Jones read and signed the statement, Eason asked him why he shot the policeman, to which Jones responded:
I'm tired of being fucked with. I go to the store and I'm fucked with.... [M]y friends are fucked with, my family is fucked with, and I'm tired of policemen *517 fucking with me ... and I decided I'd kill a policeman and that's why I did it.
This admission is consistent with the threat Jones made a week prior to the murder to another police officer, Officer Ritchey, "that [Jones] was tired of the police hassling him, that the police weren't the only ones that had guns and that he was going to shoot him a mother-fucking pig."
At the time of trial, Jones was thirty-one years of age with a high school equivalency degree and two prior felony convictions. He testified at trial that his written confession was not voluntary but was signed because he was "whipped up." He also testified that when he signed the confession he was thinking of Eason's promise that his cousin, Bobby Hammonds, would not be charged with the murder if Hammonds was not involved with the crime.
Despite his contention that the confession was not voluntary, Jones admitted that no one laid a hand on him for several hours before signing the confession. He also testified that Eason never mistreated him and that after Detective Eason showed up, "nobody else messed with [him]."
The circumstances of the arrest reveal that Officer Mundy and his fellow officer, Officer Roberts, arrived within minutes of the shooting. After checking the other apartments in the building, Mundy and his fellow officers entered Jones' completely dark apartment after receiving no response to their shouts of "police, police; open up." Mundy found Hammonds on the sofa. After Hammonds told him that no one else was in the apartment, Mundy found Jones fully dressed with his shoes on, standing by a bed in his unlit bedroom. Jones testified in his own defense that he was undressed in bed when the shooting occurred and only put his clothes on when he heard the shots. He testified that he heard the police at the door but told Hammonds not to let them in.
Jones not only disclaimed ownership of the rifles, but at trial testified that he was unaware of the presence of the rifles found under his bed, even though his fingerprint was found on one of these rifles. Jones further testified that Schofield regularly stayed at his apartment, that the rifles were Schofield's, and that Schofield had been in his apartment the night of the shooting.

ISSUES ON APPEAL
On appeal, we address Jones' claim that he is now entitled to have his conviction set aside and receive a new trial based on four separate grounds: (1) the alleged misconduct on the part of the original trial judge; (2) the State's alleged Brady violation; (3) the trial court's refusal to admit the third-party confessions as substantive evidence and failure to analyze the impeachment value of these confessions; and (4) the cumulative effect of all the newly discovered evidence and the trial court's failure to consider the cumulative effect.[4]

I. ALLEGED MISCONDUCT OF JUDGE SOUD
Jones filed a verified motion to disqualify Judge Soud in September 1997, alleging that Judge Soud had, prior to his appointment to the bench, represented him on an unrelated criminal matter in 1969. Jones alleged that during the course of that representation Judge Soud accepted a $700 bribe to be delivered to presiding Judge Harvey to ensure that Jones would receive a lesser sentence.
As alleged proof of his allegations, Jones introduced the court file of his 1969 case, which names as defendants both Jones and Willie Badger. The only mention of Judge Soud in that file is a rubber-stamped entry: "A.C. Soud, Attorney for `Deft' present in court." Neither the stamp nor the court file reveals which defendant Judge Soud represented.
Alberta Brown, the source of these claims against Judge Soud, testified that she gave *518 Jones' mother part of the $700 bribe for Judge Soud to deliver to Judge Harvey. Despite the fact that Jones, the father of her four children, has been under three death warrants since his 1981 conviction, Brown failed to come forward with these allegations until September 1997, after Jones' most recent warrant was signed, more than twenty-eight years after the alleged bribery and sixteen years after he was sentenced to death. She explained that her failure to come forward was based on her concerns that Jones' mother might get "in trouble" for the bribery. Jones' mother died shortly before Brown made these allegations.
Judge Soud testified at the evidentiary hearing and denied these allegations, insisting that he had no recollection of ever representing Jones or of the particular case. He testified that he had never given bribe money to any judge and that such conduct would be offensive and outrageous to him. Judge Soud did recall representing Jones' half-brother and becoming acquainted with Jones' mother during the course of that representation. It is undisputed that Judge Soud submitted a written disclosure of this representation to all parties prior to the 1981 trial, and that both the prosecutor and Jones signed this disclosure, agreeing that they had no objection to Judge Soud's continuing in the case. Judge Soud also testified without contradiction that during all the proceedings against Jones, neither Jones nor his attorneys had ever suggested that he had represented Jones or that Jones recognized him.
Based on all the above, Judge Johnson found that there was no credible evidence that Judge Soud had ever taken any money from anyone to pay a bribe or that would require Judge Soud to disclose a possible representation of a defendant twelve years before trial, of which he had absolutely no recollection. He found this ground for vacating the judgment and sentence to be completely meritless.
We agree with Judge Johnson's analysis and conclusion, finding no abuse of discretion. As to the claim of misconduct, Alberta Brown, the source of the allegations against Judge Soud and the mother of Jones' four children, waited sixteen years after Jones was sentenced to death to come forward. Her explanation that the delay was caused by her concern for Jones' mother is not credible in light of the fact that Jones has been under sentence of death since 1981. There is no credible evidence to support Jones' claim that Judge Soud bribed Judge Harvey on behalf of Jones.
There is also no credible evidence that Judge Soud even represented Jones in his 1969 case. Jones did not testify that Judge Soud represented him, and his lawyers admit that Jones has no recollection of that representation. Common sense dictates that Judge Soud would not disclose his representation of Jones' half-brother yet fail to disclose his representation of Jones if he had in fact previously represented Jones or had any recollection of such representation.
Assuming arguendo that Judge Soud did represent Jones, the trial court specifically found, as Judge Soud testified, that Judge Soud had no recollection of such representation. Judge Soud could not conceivably make such a disclosure if he had no recollection of ever representing Jones. Based on the foregoing, we find this issue to be completely devoid of merit.

II. THE BRADY CLAIM
We next consider Jones' Brady claim. At the December 1997 3.850 hearing, Jones orally amended his petition to include a claim that the State violated Brady by withholding exculpatory evidence concerning Officers Mundy and Eason as disclosed by Cleveland Smith. Smith is a retired twenty-four-year veteran of the Duval County Sheriff's Office who first contacted Jones' counsel in October 1997. He explained his failure to come forward sooner as motivated by his concern for his pension.
Officer Smith's pertinent testimony at the evidentiary hearing regarding Mundy and Eason fell into four main categories: (1) that Mundy was an "enforcer," and had a reputation as the department "hit man," and that Eason had a reputation as a rapist, possible murderer, and extortionist; (2) that Mundy had made up charges and beaten confessions from suspects, and that he had personally *519 witnessed Mundy extracting a confession from a suspect by placing the suspect's genitals in a vise grip; (3) that Mundy told him repeatedly, beginning two days after the murder, that he entered Jones' apartment after the shooting and started beating the people inside, with the intent to kill; and (4) that one night at roll call, not long before the murder, the officers were told that Jones had a serious fight with one of the officers and that they were to do everything in their power to "get him." Officer Smith admitted that he never told his superiors, or anyone else, about these events and statements.
Jones maintains that the information regarding Mundy and Eason was improperly withheld by the State in violation of Brady, and that there is a reasonable probability that the outcome of the trial would have been different if this information had been provided to Jones' defense.
In Brady, the United States Supreme Court held that
the suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.
373 U.S. at 87, 83 S.Ct. at 1196-97 (emphasis supplied). The specific test for determining the materiality of Brady evidence was articulated in United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383-84, 87 L.Ed.2d 481 (1985):
[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.
See also Gorham v. State, 597 So.2d 782, 785 (Fla.1992). As subsequently explained in Kyles v. Whitley, 514 U.S. 419, 435,115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995), a Brady violation is established by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."
We recently reiterated the four elements a defendant must prove in order to obtain reversal based on Brady:
(1) that the Government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.
Robinson v. State, 707 So.2d 688, 693 (Fla. 1998) (quoting Hegwood v. State, 575 So.2d 170, 172 (Fla.1991)). As to reasonable diligence, a defendant seeking postconviction relief after a death sentence has been imposed must present his Brady claim within one year of the discovery of the new evidence. See Mills v. State, 684 So.2d 801, 804 (Fla. 1996).[5]
We first consider Smith's testimony concerning Mundy and Eason's general reputation and Mundy's prior acts of misconduct. As a preliminary matter, Jones has failed to demonstrate how testimony consisting of reputation evidence or a prior dissimilar act of misconduct would have been admissible at trial under our rules of evidence, even if it had been disclosed. See §§ 90.608-.610, Fla. Stat. (1997); Farinas v. State, 569 So.2d 425, 429 (Fla.1990). If the evidence could not have been properly admitted at trial or would not be admissible on retrial, there is no reasonable probability that the outcome of Jones' trial would have been different if the evidence had been provided to the defense.
Further, there has been no showing that this evidence could not have been previously discovered by Jones with reasonable diligence. In fact, in a prehearing memorandum prior to the 1992 3.850 hearing, Jones alleged that recently discovered evidence established that Mundy had a poor reputation *520 for truth and veracity, calling into question his testimony at Jones' trial. Jones did not further pursue this claim after the trial court would not consider this evidence and also did not appeal the trial court's ruling.
We turn next to the two other aspects of Smith's testimony: (1) the statements he claims Mundy made to him about the beating and (2) the statements he claims were made at roll call. Jones argues that it is irrelevant whether the State knew about these statements, relying on the following language from Kyles:
Since, then, the prosecutor has the means to discharge the government's Brady responsibility if he will, any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.
514 U.S. at 438, 115 S.Ct. at 1568. As we stated in Garcia v. State, 622 So.2d 1325, 1330 (Fla.1993), "[i]t is irrelevant whether the prosecutor or police is responsible for the nondisclosure; it is enough that the State itself fails to disclose." The State is charged with constructive knowledge and possession of evidence withheld by other state agents, including law enforcement officers. See Gorham, 597 So.2d at 784.
While we agree with the general proposition that evidence suppressed by the police can constitute a Brady violation, there is no indication in the present case that Officer Smith's testimony was withheld by the police. The statements were not part of any documents or report in the possession of the police. Officer Smith was not even involved in the Jones' homicide investigation. See Kyles, 514 U.S. at 437, 115 S.Ct. at 1567. Further, there is no indication that he revealed the information to any investigator in the case. In fact, he affirmatively testified that he told no one.
Even assuming that this undisclosed information held by an individual police officer who is not involved in the investigation could constitute Brady material, Officer Smith's testimony that Mundy told him that he beat the occupants of the apartment is not inconsistent with Mundy's trial testimony that he hit Hammonds with a rifle when Hammonds would not respond to his commands and that when Hammonds resisted arrest, he again hit him with a rifle and subdued him with great difficulty. There was also testimony at trial that the arresting officers were involved in a fight with Jones when Jones also resisted arrest.[6]
Contrary to Jones' assertions, Smith did not testify that Mundy said he beat a confession out of Jones. Further, Smith admitted that he could not say whether Mundy was referring to Jones or Hammonds when he bragged about beating the "guy" who was put in jail.
Moreover, the confession, taken by Officer Eason, occurred many hours after Jones was released from the hospital, having been treated for what the treating physician described as "minor injuries." It was Eason, not Mundy, who was involved in the interrogation of Jones, and there is no allegation of wrongdoing against Eason in this case. Jones testified that no one "messed with him" or laid a hand on him after Eason showed up.
The testimony regarding the statement made at the roll-call meeting presents a *521 different evidentiary issue. This hearsay testimony would not have constituted impeachment of any state witness, as there is no assertion that any of the state witnesses, including Mundy and Eason, were present at the roll call or knew about the statements. Jones argues that the hearsay statements would have nevertheless been admissible to show that the police were "out to get" him. Once again, there is no evidence that those present at the roll call participated in the investigation.
At most, this testimony might have been admissible in rebuttal, after the State asked Jones if he knew of any reason why the police would be out to get him. Even if these statements could have been admissible as non-hearsay state-of-mind evidence relevant to motive, there is no evidence that the case against Jones was fabricated. There is also no evidence that the arrest of Jones was racially motivated on the part of the officers, including Officer Mundy, who himself was black.
Even assuming the marginal relevance of the roll-call testimony, and further assuming the testimony could be considered Brady material, as Kyles points out, "showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more." Kyles, 514 U.S. at 437, 115 S.Ct. at 1567. It is the net effect of the evidence that must be assessed. Id. Based on our evaluation of all the admissible evidence, we conclude that there is no reasonable probability that if Smith's testimony had been disclosed the outcome of the proceedings would have been different. See Robinson, 707 So.2d at 692-93. Smith's testimony could not reasonably be taken to put the whole case in a different light as to undermine confidence in the verdict. See Kyles, 514 U.S. at 435,115 S.Ct. at 1566. However, as discussed more fully below, we will consider Smith's testimony as newly discovered evidence and evaluate it cumulatively with the other admissible newly discovered evidence. See Swafford v. State, 679 So.2d 736, 739 (Fla.1996).

III. NEWLY DISCOVERED EVIDENCE
As he has maintained since his 1981 trial, Jones again claims that he is innocent of this crime. He alleges, as he alleged in his prior 3.850 motion, that newly discovered evidence establishes that Glen Schofield killed Officer Szafranski. Two requirements must be met in order for a conviction to be set aside on the basis of newly discovered evidence. First, in order to be considered newly discovered, the evidence "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence." Torres-Arboleda v. Dugger, 636 So.2d 1321,1324-25 (Fla.1994).
Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. Jones, 591 So.2d at 911, 915. To reach this conclusion the trial court is required to "consider all newly discovered evidence which would be admissible" at trial and then evaluate the "weight of both the newly discovered evidence and the evidence which was introduced at the trial." Id. at 916.
In considering the second prong, the trial court should initially consider whether the evidence would have been admissible at trial or whether there would have been any evidentiary bars to its admissibility. See Johnson v. Singletary, 647 So.2d 106, 110-11 (Fla.1994); cf. Bain v. State, 691 So.2d 508, 509 (Fla. 5th DCA 1997). Once this is determined, an evaluation of the weight to be accorded the evidence includes whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. See Williamson v. Dugger, 651 So.2d 84, 89 (Fla.1994). The trial court should also determine whether the evidence is cumulative to other evidence in the case. See State v. Spaziano, 692 So.2d 174, 177 (Fla.1997); Williamson, 651 So.2d at 89. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence. Where, as in this case, some of the newly discovered evidence includes the testimony of individuals who claim to be witnesses to events that occurred at the time of the crime, the trial court may consider both *522 the length of the delay and the reason the witness failed to come forward sooner.
Because this appeal involves a second evidentiary hearing in which claims of newly discovered evidence were presented and evaluated by a trial judge, we must evaluate all the admissible newly discovered evidence at this hearing in conjunction with newly discovered evidence at the prior evidentiary hearing and then compare it with the evidence that was introduced at trial.[7]See Swafford, 679 So.2d at 739; cf. Kyles, 514 U.S. at 441,115 S.Ct. at 1569. We divide our analysis into two parts: those witnesses who place Schofield at the scene of the crime, and those witnesses to whom Glen Schofield has allegedly confessed in the years following Jones' conviction.

A. Eyewitness Testimony
As our opinion in Jones v. State, 678 So.2d 309 (Fla.1996), sets forth, during the first evidentiary hearing on newly discovered evidence in 1992, two witnesses, Daniel Cole and Sharon Denise Reed, testified that shortly after hearing gunshots they observed Glen Schofield running with a rifle in his hand away from the murder scene. Martha Bell, Denise Reed's mother, testified that Reed telephoned her the next morning to relate this information. The trial court concluded that the testimony of these three witnesses "tenuously qualified as newly discovered evidence," id. at 312, and then found that Cole and Reed's testimony was marginally admissible and Martha Bell's testimony would have been admissible if the State challenged Reed's testimony. As to the credibility of these witnesses, this Court observed:
As the trial court noted, these three witnesses are something less than credible, to wit: (1) Cole testified that he had been convicted of five felonies; (2) Reed testified that Jones was her friend and that he grew up in her grandmother's neighborhood; and (3) Bell testified that she knew Jones and that "we all lived in the same neighborhood." Moreover, we have reviewed the transcript from the hearing and we find that the testimony of Cole and Reed was rife with inconsistencies.
Id. at 315. We agreed with the trial court that if the testimony of Cole, Reed, and Bell had been presented at trial the jury would probably not have acquitted Jones:
Assuming arguendo that the jury would have believed these witnesses had they testified at trial, their testimony merely buttresses evidence presented at trial linking Schofield to the murder. At trial, the jury heard testimony (1) that the rifles discovered in Jones' apartment allegedly belonged to Schofield; (2) that Schofield allegedly was at Jones' apartment the night of the murder; and (3) that Schofield allegedly left Jones' apartment armed with a handgun an hour before the murder. In spite of this evidence, the jury found, beyond a reasonable doubt, that Jones murdered Officer Szafranski. We concur that it is not probable that the testimony of Cole, Reed, and Bell, without more, would have created a reasonable doubt in the minds of the jurors.
Id.
At the most recent evidentiary hearing conducted by Judge Johnson, Jones presented three additional eyewitnesses, Roy "Shorty" Williams, James Corbett, and Dwayne Hagans, who placed Schofield in the vicinity of the crime that evening. The trial court considered each of these witnesses to be newly discovered and then properly proceeded to evaluate the credibility of their testimony.
Williams' testimony placed Schofield at the scene of the crime with a rifle. The trial court observed that Williams' testimony was riddled with inconsistencies, contradictions, and statements that could not be true. For example, Williams first testified that he saw Schofield in the bushes and later said he never saw him in the bushes. He testified that he saw Schofield shoot the rifle, then later testified he did not see Schofield shoot the rifle. Although Williams testified that he *523 saw Schofield kneeling on the ground with a rifle, Judge Johnson pointed out that this position is inconsistent with the physical evidence concerning the trajectory of the bullet. Finally, Williams admitted he was "not really sure" it was Schofield he saw with the rifle that night.
Williams also testified that Officer Szafranski's vehicle was parked and that the officer exited his vehicle and was writing a report prior to his murder. Williams further testified that a young woman he was with approached the car after Officer Szafranski was shot. All this testimony is plainly contradicted by Officer Wilmoth, who was at the scene when the shooting occurred, and Officer Dyal, who was driving immediately in front of Officer Szafranski's vehicle. Without regard to who may have shot Officer Szafranski, it has never been seriously contended that Officer Szafranski's vehicle was parked, or that he was outside his vehicle writing a report prior to his murder. Williams has been convicted of multiple felonies and waited sixteen years to come forward with his testimony. Considering Williams' criminal history, in conjunction with the numerous inconsistencies and contradictions in his testimony, we agree with Judge Johnson that Williams' testimony lacks any credibility.
James Corbett also testified to Schofield's presence at the scene, claiming to have seen Schofield on the upstairs porch of the apartment building holding a weapon between 11:30 p.m. and midnight. He further testified that two or three hours later he heard shots and saw Schofield running down the street with a bat or rifle, with his girlfriend Marion not far behind him.[8] Judge Johnson noted, based on the known angle of the bullet as it entered the windshield, that Officer Szafranski could not have been shot from the upstairs porch.
Further, Corbett's testimony that he saw Schofield on the upstairs porch around midnight merely confirms that Schofield was at Jones' apartment earlier on the night of the murder, a fact that no one has ever disputed. Corbett's testimony that he saw Schofield hours later running from the scene of the crime is cumulative to the testimony of Cole and Reed placing Schofield in the vicinity of the murder after the shots were heard.
Lastly, Dwayne Hagans, who is currently serving a life sentence for murder, testified that Schofield and another individual flagged him down and asked him to "hold [Schofield's] rifle down." Hagans admitted he never saw the rifle. In his prior affidavit, Hagans did not mention this alleged encounter with Schofield. Judge Johnson found Hagans' testimony lacking in credibility. We agree. Moreover, even if this encounter occurred, the testimony regarding it is both cumulative to testimony placing Schofield in the area and contradictory to Cole and Reed's testimony that they saw Schofield alone.
Judge Johnson found that "the combined testimony of Roy Williams, James Corbett and Dwayne Hagans, or any two of them, if given at trial would not probably result in defendant's acquittal." We agree with this conclusion.

B. Schofield's Alleged Confessions
At Jones' 1992 evidentiary hearing, the trial court also considered as newly discovered evidence testimony from a number of individuals who had served time with Schofield[9] that Schofield confessed to the murder of Officer Szafranski. One of Schofield's former girlfriends, Patricia Owens Ferrell, testified that Schofield confessed to her as well. The trial court concluded that none of these alleged hearsay confessions would be admissible as substantive evidence under the exception for declarations against penal interest because Schofield was available to testify, although neither party called him. However, at Jones' most recent evidentiary hearing, Schofield did testify that he did not kill Officer Szafranski and that he never told anyone he did. He further acknowledged that he *524 went to Jones' apartment earlier that evening to exchange some cocaine for some heroin. Although the times vary, this testimony is consistent with Jones, Hammonds, and Corbett's testimony placing Schofield at the apartment the night of the murder.
Louis Reed, Carnell Grayer, Jasper Ray Kirtsey, and Dwayne Hagans, inmates at various state prisons, testified at the most recent hearing that Schofield told them he killed the officer. The trial court treated this testimony as prior inconsistent statements of Schofield and considered it as impeachment evidence, rather than substantive evidence of Schofield's culpability. See §§ 90.608(1), 90.614(1), 90.801(1)(c), 90.802, Fla. Stat. (1997). Jones claims that the trial court erred in not admitting the statements as substantive evidence and in failing to address their impeachment value.
We first consider whether these statements should have been admitted as substantive evidence. Pursuant to section 90.804(2), Florida Statutes (1997), in order for a confession to be admissible as a declaration against penal interest, the declarant must be unavailable as a witness and there must be corroborating circumstances to show the trustworthiness of the statement. The requirement of unavailability parallels Federal Rule of Evidence 804(b)(3), as well as the evidence rules of the vast majority of state court jurisdictions. See McCormick on Evidence § 320 (John Strong ed., 4th ed.1992). Because Schofield was available and in fact testified at the most recent proceeding, section 90.804(2) precludes a consideration of the hearsay testimony as substantive evidence.[10]
Jones does not attack the constitutionality of section 90.804(2). He concedes that section 90.804(2) applies but asserts that due process considerations set forth in Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), require that this testimony be evaluated as substantive evidence. In Chambers, the Supreme Court relied on the following factors to justify the admission of the hearsay confessions of a third party, despite state evidentiary rules to the contrary: (1) each confession was made spontaneously to a close acquaintance after the murder occurred; (2) each confession was corroborated by some other evidence in the case; (3) each confession was self-incriminatory and unquestionably against interest; and (4) if there was any question as to the truthfulness of the statements, the declarant was available for cross-examination. See id. at 300, 93 S.Ct. at 1048. As the Supreme Court observed about the statements:
The hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability.
Id.
We have previously explained the facts and circumstances of Chambers:
Another individual made three verbal confessions to this crime and one written confession which he later repudiated. The prosecution did not call this declarant as a witness so the defense did. At that time, under the "voucher" rule in Mississippi, one could not impeach one's own witness. Therefore, the defense was not allowed to have the verbal confessions admitted into evidence for that purpose. In addition, the hearsay rule prevented the testimony from being heard and Mississippi had no exception to the rule based on declarations against penal interest.
Card v. State, 453 So.2d 17, 21 (Fla.1984). In Gudinas v. State, 693 So.2d 953, 965 (Fla. 1997), cert. denied, ___ U.S. ___, 118 S.Ct. 345, 139 L.Ed.2d 267 (1997), we recently characterized Chambers as "limited to its facts due to the peculiarities of Mississippi evidence law which did not recognize a hearsay exception for declarations against penal interest."
The Supreme Court stated in Chambers that it was establishing no new standards of *525 constitutional law, nor was it diminishing the authority of the states over their own trial rules. Chambers, 410 U.S. at 302, 93 S.Ct. at 1049. Rather, "under the specific facts of [Chambers], where the rejected evidence bore persuasive assurances of trustworthiness, its rejection denied the defendant a trial in accordance with due process standards." Card, 453 So.2d at 21 (citing Chambers, 410 U.S. at 302, 93 S.Ct. at 1049).
We considered and rejected these same arguments in Jones' prior 3.850 appeal, finding that unlike the statements made in Chambers, Schofield's alleged confessions did not bear "persuasive assurances of trustworthiness." Jones, 678 So.2d at 315. Jones asserts, however, that the circumstances have changed since the 1992 3.850 hearing and ensuing appeal because of additional evidence discovered since his last evidentiary hearing. He claims that because of this additional evidence Schofield's confessions now bear sufficient indicia of reliability.
We disagree. None of the additional evidence requires that we disregard the plain language of section 90.804(2). The issue of whether or not the confessions bear sufficient indicia of reliability affects the admissibility as substantive evidence only if the declarant is unavailable as a witness. See § 90.804(2). Unlike Chambers, where the oral confessions were not allowed for any purpose at the defendant's original trial, in this last evidentiary hearing, Judge Johnson considered the confessions as impeachment evidence because Schofield testified.
Moreover, unlike the confessions in Chambers, the alleged confessions in this case lack indicia of trustworthiness. The fact that more inmates have come forward does not necessarily render the confessions trustworthy.[11] The confessions were not made prior to the original trial in circumstances indicating trustworthiness, such as spontaneously to a close acquaintance as in Chambers, or to his own counsel or the police shortly after the crime, see, e.g., Wilkerson v. Turner, 693 F.2d 121 (11th Cir.1982); United States ex rel. Gooch v. McVicar, 953 F.Supp. 1001 (N.D.Ill.1997), but were made to a variety of inmates with whom Schofield served prison time.
All of the statements were allegedly made after Jones had been sentenced to death; in many cases more than a decade elapsed before the inmate came forward to testify as to Schofield's alleged statements. As to the five inmate witnesses who testified at the most recent hearing, none came forward until after Jones' most recent death warrant was signed, waiting anywhere from four to fifteen years to report their information.
Except for Schofield's former girlfriend, the witnesses were all prison inmates with extensive felony records. However, it is not their felony records alone that cast doubt on the witnesses' credibility. Judge Soud's observations in his 1992 order, wherein he analyzed the reasons the confessions were not particularly reliable, are equally valid here even in light of the testimony of the additional witnesses. Like the witnesses in 1992, the witnesses who testified at the most recent evidentiary hearing spoke only in general terms of Schofield's possible involvement in the murder of Officer Szafranski. No witness testified to any unique details surrounding the murder. In fact, none of the witnesses related specific details of the crime.
Even with their lack of detail, the alleged confessions are somewhat contradictory. For example, while one inmate testified that Schofield told him he threw the rifle in the river, another testified Schofield asked him to "hold down" the rifle for him. Three witnesses claimed that Schofield told them he shot Officer Szafranski because Szafranski was "fucking" with Schofield or that he was a "bad cop" who had been taking money from drug dealers.
While it may be that the inmates were testifying falsely, it may also be that Schofield bragged about a killing he did not commit. *526 An individual's alleged confession to a capital murder would generally be considered to be against one's penal interest. However, in a prison environment, statements concerning involvement in the murder of a police officer may be viewed differently. We noted in Jones' previous 3.850 appeal that "a statement by one criminal to another criminal ... is more apt to be jailhouse braggadocio than a statement against his criminal interest." Jones, 678 So.2d at 314 (quoting United States v. Seabolt, 958 F.2d 231, 233 (8th Cir.1992)). In fact, one inmate testified that Schofield told him that he "got his stripes" by killing a police officer. As Judge Soud observed in his 1992 order, among prisoners a claim of involvement in a police officer's murder may in fact elevate the inmate's status or reputation.
Therefore, whether we consider the alleged confessions as impeachment or substantive evidence, we do not find that this evidence requires a new trial based on newly discovered evidence.

IV. CUMULATIVE EFFECT
In considering all of the alleged confessions and all of the admissible newly discovered evidence, the only consistency over the years is the bare allegation of Schofield's involvement. Depending on which witness' version of events is to be believed, Schofield shot Officer Szafranski from the porch, or from the vacant lot next to Jones' apartment building; Schofield disposed of the gun in the river, or tried to give it to an acquaintance to "hold down;" Schofield either fled the scene in a car, fled on foot alone, or fled on foot accompanied by his girlfriend. As the State points out, it has never been disputed that Schofield was a drug dealer in the area, that Schofield had been in Jones' apartment earlier that evening, or that Schofield was initially a suspect.
Although we do not consider Smith's testimony as requiring reversal under Brady, we have reviewed it, combined with the other newly discovered evidence, to evaluate whether it would probably produce an acquittal on retrial. See Swafford, 679 So.2d at 739.[12] Despite his claims that his confession was coerced, Jones admitted that he had not been touched for several hours preceding his confession. Jones was medically evaluated hours before the confession and was found to have only minor injuries. Eason, who was the officer interrogating Mundy, is not accused of any wrongdoing in this case. In addition to confessing to the crime, Jones made the statement days prior to the murder, during his arrest on a weapons charge, that he was tired of police hassling him, that the police were not the only ones who had guns, and that "he was going to shoot him a mother-fucking pig."
The physical evidence implicating Jones included the trajectory of the bullet and the recoil mark on the window sill of the downstairs apartment in Jones' building. Experts identified Jones' fingerprint on a rifle that was found under his bed minutes after the shooting. This rifle was the exact make and model as the rifle which fired the shot that killed Officer Szafranski. Evaluating Smith's testimony in light of evidence produced at trial, and in conjunction with the other newly discovered evidence, we find that this testimony would not probably produce an acquittal on retrial.
In evaluating Jones' Brady claim, along with the newly discovered evidence implicating Schofield as well as Schofield's alleged confessions, what we observed in our prior opinion applies here with equal force:
At most, the evidence linking Schofield to the murder suggests that Schofield might have participated in the shooting along with Jones. None of this evidence weakens the case against Jones so as to give rise to a reasonable doubt as to his culpability.
Jones, 678 So.2d at 315.
Accordingly, we affirm the denial of Jones' motion for postconviction relief. No motion for rehearing will be heard.
It is so ordered.
*527 OVERTON, HARDING, WELLS and PARIENTE, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion.
KOGAN, C.J., concurs in result only.
SHAW, J., dissents with an opinion.
ANSTEAD, Justice, concurring in part and dissenting in part.
This is a troubling case because it presents a serious issue of guilt and innocence. It is troubling not because the State did not present sufficient and substantial evidence of Jones' guilt at his trial (it did), or because there is any validity to Jones' claim that he was tried by a biased judge. (There is no validity to such claim). Rather, it is troubling because of the sheer volume of evidence present in the record that another person committed the murder, and, yet, none of this evidence was heard by the jury that tried and convicted Jones. Surely it defies common sense, as well as the holding in Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), to hold that at a trial conducted to determine the truth about this most egregious of crimes carrying the ultimate penalty, extensive evidence of another person's guilt as well as evidence of police misconduct would not be admissible as substantive evidence of innocence.
The analysis in the majority opinion takes each of the separate pieces of evidence that another person committed this crime, and attempts, largely by speculation, to discount the credibility and reliability of each, item by item. However, I believe that controlling United States Supreme Court decisions compel us to consider this evidence together, and, when that is done, it compels a conclusion that this evidence should be considered as substantive evidence and that a new trial should be conducted in which a jury should be given the opportunity to properly evaluate the credibility and weight of such evidence. See Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). There is just too much here to be ignored, and we are the only forum available to say so.[13] It is because of the existence of this evidence, although in far lesser amount, that we mandated an evidentiary hearing in this case in 1991. See Jones v. State, 591 So.2d 911 (Fla.1991).

POLICE CORRUPTION
A separate but important aspect of this case concerns the testimony of Officer Cleveland Smith who has come forward only upon his retirement from the police force, to inform the court of a corrupt culture that prevailed in the police force at the time of this murder, and that specifically implicated two key police officer witnesses in this case. The State concedes the impeccable record of Officer Smith and makes no attempt to challenge his credibility in this regard. Hence, Officer Smith's damning testimony about the police culture and the officer witnesses in this case cannot be brushed aside lightly. We should be very concerned that such a culture existed at the time, and that Officer Smith was so intimidated by this culture that he would not come forward until he had retired and safely secured his pension.[14]
Rather than challenging Smith's testimony, the State concedes that these officers may have been the bad actors described by Smith and indeed, that they were ousted from the police force years ago. In terms of the case before us, Smith's testimony is important evidence that these particular police officer witnesses were intent on making a case against Jones at any price. At a bare minimum, this testimony constitutes important impeachment evidence against two of the State's most important witnesses. In addition to Officer Smith, another witness whose credibility is not challenged by the State, Bill White, an Assistant Public Defender, *528 presented testimony of police misconduct in this case.

EVIDENCE OF SCHOFIELD'S GUILT
The most important issue before us concerns the admissibility of the enormous amount of evidence that has been disclosed since Jones' trial indicating that Glen Schofield actually committed the murder.[15] I cannot accept the majority's restrictive interpretation of Chambers and the majority's conclusion that the evidence of Schofield's *529 guilt cannot be considered as substantive evidence in Jones' defense.[16] In Chambers, a case remarkably similar to this and also involving the shooting death of a police officer, the Supreme Court held that an accused's fundamental right to present evidence in his own behalf required a state court to admit the testimony of several witnesses that a third party had made oral confessions of guilt to the same crime. The Supreme Court emphasized that "[t]he sheer number of independent confessions provided additional corroboration for each." In explaining its decision, the Supreme Court declared:
The hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability. First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case McDonald's sworn confession, the testimony of an eyewitness to the shooting, the testimony that McDonald was seen with a gun immediately after the shooting, and proof of his prior ownership of a .22-caliber revolver and subsequent purchase of a new weapon. The sheer number of independent confessions provided additional corroboration for each. Third, whatever may be the parameters of the penal-interest rationale, each confession here was in a very real sense self-incriminatory and unquestionably against interest. See United States v. Harris, 403 U.S. 573, 584, 91 S.Ct. 2075, 2082, 29 L.Ed.2d 723 (1971); Dutton v. Evans, 400 U.S., at 89, 91 S.Ct., at 219. McDonald stood to benefit nothing by disclosing his role in the shooting to any of his three friends and he must have been aware of the possibility that disclosure would lead to criminal prosecution. Indeed, after telling Turner of his involvement, he subsequently urged Turner not to "mess him up." Finally, if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and was under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury. See California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). The availability of McDonald significantly distinguishes this case from the prior Mississippi precedent, Brown v. State[, 99 Miss 719, 55 So. 961 (1911)], supra, and from the Donnelly-type [Donnelly v. U.S., 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913)] situation, since in both cases the declarant was unavailable at the time of trial.
410 U.S. at 300-01, 93 S.Ct. at 1048-49 (footnote omitted). This case is very similar to Chambers, if not stronger on its facts. All of the "hot button" factors considered by the Court in Chambers are implicated, and, of course, we have the additional factor of the misconduct of the important police witnesses, a factor not present in Chambers.
Further, here we have many times the number of confessions by the third party as was involved in Chambers. There is an almost endless list of witnesses to whom Schofield has confessed. In addition to the numerous confessions, there is extensive evidence of Schofield's guilt established by various witnesses who saw him at the scene of the murder. The overwhelming volume of this evidence clearly serves to corroborate its individual components. And, as in Chambers, Schofield was actually called as a witness and subject to examination by both sides in the most recent evidentiary hearing.
True, some of the witnesses to whom Schofield confessed are convicted felons and prison inmates whose credibility will have to be closely scrutinized. However, we cannot ignore the fact that the State routinely relies on "jailhouse confessions" to secure convictions in criminal cases, including many murder cases. Obviously, the State would have a powerful case against Schofield with the evidence *530 that has been presented against him in this case.[17] As in Chambers, we cannot ignore "the sheer number" of witnesses and evidence that has now been accumulated and presented implicating Schofield. That evidence now, in fact, far exceeds the evidence considered by the Supreme Court in Chambers. Under these circumstances, we cannot simply ignore the observation of the United States Supreme Court:
[W]here constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.
Chambers, 410 U.S. at 302, 93 S.Ct. at 1049. Finally, and that word has special meaning here, Chambers was not a death penalty case. This is.
SHAW, Justice, dissenting.
Newly discovered evidence in the form of testimony by recently retired police officer Cleveland Smith shows that at the time Leo Jones was taken into custody in 1981 two critical witnesses against him, fellow officers to Smith in the Duval County Sheriff's Office, routinely engaged in illegal and brutal tactics that now place in question the validity of Jones' confession. Other newly discovered evidence in the form of testimony by numerous eyewitnesses and jailhouse confidants implicates another person, Glen Schofield, in the killing of Officer Szafranski. Based on the cumulative weight of this evidence, the integrity of the fact-finding process is called into question and in my opinion a new trial is required.

I. OFFICER SMITH'S TESTIMONY
At the evidentiary hearing below, Officer Smith testified that he worked as a patrolman for the Duval County Sheriff's Office in Jacksonville, Florida, for twenty-four years and recently retired in good standing. He testified extensively concerning the actions of Officer Lynwood Mundy, who was among the first officers on the scene at Jones' apartment after the shooting. Officer Smith explained:
Q. What did did Officer Mundy tell you about Leo Jones?
A. We, we talked about it several times. He told me that he kicked in a door and that he just started beating people. He says his intention was to kill somebody, and that another officer stopped him from doing it.
Q. Did he indicate who he intended to kill?
A. He said whoever was inside the building.
Officer Smith stated that Mundy routinely fabricated charges and misrepresented facts on police reports:
Q. Did you have occasion to actually patrol with Officer Mundy?
A. Yes, sir.
....
Q. To your knowledge, did Officer Mundy make up charges?
A. Yes, sir, he did.
Q. Did you refuse to sign reports because Officer Mundy had misrepresented the facts?
A. Yes, sir, I did.
To explain Mundy's penchant for violence, Officer Smith related the details of a prior arrest in an unrelated case:
A. There was a robbery at the Trailways Bus Station one night, and several of us responded to the call. By the time I arrived, they hadan officer had one of the suspects in the rear of a police car. Officer Mundy pulled up. He got out of his car, walked over to the back of the other police car, opened the door, started questioning the suspect. The suspect wouldn't give him any answers.
Officer Mundy then closed the door, went to the trunk of his vehicle, got out a pair of vise grips [i.e., large pliers]. Officer Mundy then came back to the police car, opened the rear of the car, told the suspect to place his legs outside the vehicle while he was still seated.
When the suspect did, Officer Mundy grabbed his genitals with the vice grips, *531 and made him tell everything he [i.e., Mundy] wanted him to tell him.
When Officer Smith was asked what prompted him to come forward after all these years, he explained:
A. To be honest with you, I never kept up with the trial. What happened was, I was reading the paper in September, and I read in the paper where Mr. Jones stated that Lynwood Mundy beat a confession out of him. He said the confession was beaten out of him.
And the time I read it, I said, it's true, Lynwood beat the confession out of him, because I had never heard that before [i.e., Jones' allegation that he had been beaten]....
....
THE COURT: How can you say it's true?
THE WITNESS: It was the stories that Lynwood had been telling me.
Just prior to the present crime, officers had specifically been ordered to target Leo Jones:
A. And it was brought up at roll call that an officer had had a fight, a very serious fight, and that the suspect involved was a Mr. Jones. We were told to do everything in our power to put Leo Jones in jail.
When asked why he had not come forward before, Officer Smith was straightforward: "Well, I'll be honest with you: I wanted my pension."
After he testified that Mundy had tried to implicate him in criminal activity (by getting him to lie on police reports), Officer Smith was asked why he had never turned Mundy in to Internal Affairs:
Q. Okay. Then if he was trying to implicate you in a crime, why didn't you ever come to me or somebody else in our office and say you need to know about this man?
A. Because I didn't' trust anybody.
Q. Are you saying you didn't trust me?
A. I didn't trust anybody.
Q. Why didn't you submitwhy didn't you give confidential affidavits to Internal Affairs when they were trying to fire Lynwood Mundy?
A. When I went to Internal once about a police officer pistolwhipping an 11-year-old kid. By the time the investigation was over, I was told I didn't see what I thought I saw and if I didn't keep my mouth shut, that I could have serious problems.
Mundy's tactics were common knowledge at the departmentand in fact were viewed by other officers as a resource:
A. Everybody knowsit was common knowledge that Officer Mundy was like a hit man on the police department.
....
A. The point I'm trying to make is that Officer Mundy has certain leeways that he was allowed. He was allowed certain things that go on. In fact, he was called to certain problems in order to beat suspects up.
Officer Smith related Mundy's account of his actions when he entered Jones' apartment:
A. Well, I asked him [i.e., Mundy], I said, "What happened?"
He says, "Man, you should have seen it." He says, "Man, I just went and I kicked the door open." He says, "There was this guy in there and I just started beating him and beating him and beating him."
I said, "Beating who?"
He said, "A guy we put in jail."
I said, "How did you know that was the one?"
He said, "Man, we didn't care who we got. We were going to get somebody."
In discussing Mundy's reputation on the force, Officer Smith explained that Mundy was recognized as "an enforcer":
Q. And in the course of cross-examination, you were asked about Lynwood Mundy's reputation. What exactly was Mundy's reputation?
A. Mundy was an enforcer. Plain and simple. That's what he was. If somebody had somebody that was giving them a hard timeyou hear it all the time on the radio, "I need Officer Mundy." And everyone knew what it meant. Officer Mundy was going to kick somebody's butt.
*532 Officer Eason, the officer who obtained Jones' confession hours after the crime, also had a dubious record:
Q. And what was Hugh Eason's reputation?
A. He was a rapist, possible murderer.
....
A. An extortionist.
In conclusion, Officer Smith recapitulated his account of Officer Mundy's actions on the scene:
A. Well, like I say, he told me the story several times, and each time he would add a little more and a little more, and it all basically stayed the same. It was basically the same story: That he kicked that door down and that he just started beating people. He didn't care who he was beating; he just started beating people.
....
Q. And did he indicate that he knew that it was Leo Jones as the individual he was beating?
A. To be honest with you, I don't think he really cared who he was beating, as long as he was beating somebody.

II. TESTIMONY IMPLICATING SCHOFIELD
During the course of the present and prior evidentiary hearings, Leo Jones introduced the testimony of numerous eyewitnesses who implicated Jones' roommate, Glen Schofield, in the crime. Two witnesses, Daniel Cole and Sharon Denise Reed, testified at the 1992 hearing that shortly after hearing gunshots they saw Schofield running from the scene with a rifle. Reed's mother, Martha Bell, testified that Reed related this information to her the next morning. Jones presented three additional eyewitnesses at the present hearing, Roy "Shorty" Williams, James Corbett, and Dwayne Hagans, who placed Schofield at the scene with a rifle or weapon.
Jones also presented the testimony of numerous persons to whom Schofield confessed to the murder. One of Schofield's former girlfriends, Patricia Owens, testified at the 1992 hearing that Schofield told her that he killed the officer, and this testimony was echoed by three inmates, Frank Pittro, Franklin Delano Prince, and Donald Perry. Jones presented four additional inmates at the most recent hearing, Louis Reed, Carnell Grayer, Jasper Ray Kirtsey, and Dwayne Hagans, who testified that Schofield told them he killed Officer Szafranski.

III. THE STANDARD OF REVIEW
In reviewing a trial court's order following an evidentiary hearing on a claim of newly discovered evidence, our task on appeal is twofold: We must review the record to determine (1) whether the court applied the right rule of law, and (2) whether competent substantial evidence supports its ruling:
In reviewing a trial court's application of the [relevant] law to a rule 3.850 motion following an evidentiary hearing, this Court applies the following standard of review: As long as the trial court's findings are supported by competent substantial evidence, "this Court will not `substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.'"
Blanco v. State, 702 So.2d 1250, 1252 (Fla. 1997) (quoting Demps v. State, 462 So.2d 1074,1075 (Fla.1984)).
The proper rule of law for determining whether proffered evidence qualifies as "newly discovered" evidence was set forth in Hallman v. State, 371 So.2d 482 (Fla.1979):
The facts upon which the petition is based must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known them by the use of diligence.
Id. at 485. The standard for determining whether newly discovered evidence warrants a new trial was established in Jones v. State, 591 So.2d 911, 915 (Fla.1991):
Thus, we hold that henceforth, in order to provide relief, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.
Id. at 915.

IV. NEWLY DISCOVERED EVIDENCE
Applying the above standards to the present case, the record fails to show that the *533 trial court applied the right rule of law in its order denying rule 3.850 relief, or that competent substantial evidence supports its ruling. While Officer Smith's testimony at the evidentiary hearing comprises nearly sixty pages of record transcript, the trial court devoted just three sentences to the matter. The court's ruling is terse, cryptic, and factually inaccurate:
The testimony of Cleveland Smith primarily dealt with Officers Mundy and Eason. Their role in this case was before the jury and the Florida Supreme Court. The further fact that Officer Mundy said he wanted to put Jones in jail adds nothing to detract from the proof offered at trial.[[18]]
In the proceeding below, the defense presented Officer Smith's testimony as Brady material[19] and yet the trial court failed to evaluate the evidence under any legal standard. Further, the record contains no competent substantial evidence to support its summary dismissal of the testimony. The trial court's order denying relief thus is defective.
Rather than assessing Officer Smith's testimony as Brady material, this Court should evaluate the testimony as newly discovered evidence. Based on the present record, the testimony meets both prongs of the Hallman and Jones tests. First, the testimony qualifies as "newly discovered" evidence under Hallman because the testimony was "unknown by the trial court, by the party, or by counsel at the time of trial," and the "defendant or his counsel could not have known [it] by the use of diligence." 371 So.2d at 485. Given the tenor and content of Smith's statements, the testimony could not have been discovered with diligence until he came forward in 1997 after his pension was secure.
The testimony also satisfies the second prong of the newly discovered evidence standard in Jones, i.e., the testimony "would probably produce an acquittal on retrial." 591 So.2d at 915. Eleven hours after he was taken into custody, Jones signed a brief four-sentence confession written by Officer Eason:
L.J. I, Leo Jones have been given my rights and I fully understand them and am making this statement on my own free will. I have given Det. Eason permission to write this statement for me. I, Leo Jones on 23 May 81 took a rifle out of the front room of my apartment and went down the back stairs and walked to the front empty apartment and shot the policeman through the front window of the apartment. I then ran back upstairs and hid the gun or rifle and then the police came. L.J.
Jones v. State, 440 So.2d 570, 573 (Fla.1983). The confession was the cornerstone of the State's case at trial. See Jones v. State, 591 So.2d 911, 913 (Fla.1991) ("At trial, the State relied heavily upon the confession."). This confession would probably be inadmissible at a new trial as explained below.

V. THE CONFESSION
This Court recently reaffirmed the abiding standard in Florida for determining the admissibility of a defendant's confessionthe defendant must be "uninfluenced by fear":
[B]ecause of the tremendous weight accorded confessions by our courts and the significant potential for compulsionboth psychological and physicalin obtaining such statements, a main focus of Florida confession law has always been on guarding against one thingcoercion. We defined the abiding standard for determining the admissibility of a confession nearly a century and a half ago:
To render a confession voluntary and admissible as evidence, the mind of the accused should at the time be free to act, uninfluenced by fear or hope. To exclude it as testimony, it is not necessary that any direct promises or threats be made to the accused. It is sufficient, if the attending circumstances, or declaration of those present, be calculated to delude the prisoner as to his true position, *534 and exert an improper and undue influence over his mind.

Simon v. State, 5 Fla. 285, 296 (1853). The test thus is one of voluntariness, or free will, which is to be determined by an examination of the totality of the circumstances surrounding the confession.
Traylor v. State, 596 So.2d 957, 964 (Fla. 1992) (emphasis added and omitted).
Under the above standard, Jones' confession would probably be suppressed at a new trial in light of Officer Smith's testimony. The fact that Jones was in the apartment when the door was kicked in by police and the occupants were set upon by Officer Mundya rogue cop who was intent not on capturing but killing themis sufficient by itself to create an atmosphere of coercion that could not be dispelled in a matter of hours. The occupants of the apartment were dealing withaccording to Officer Smitha pathological officer who was intent on beating them to death, an officer who was known as "a hit man" or "an enforcer," an officer who had extracted a confession via pliers to the testicles, and an officer who had fabricated charges and falsified reports. Mundy was later fired from the police force in disgrace.
Further, the confrontation at the apartment took place in a climate where officers openly called on the radio for the services of "a hit man" or "an enforcer" in order "to beat suspects up," and where an officer pistol-whipped an eleven year-old child with impunity. The confession itself was signed at the Police Memorial Building eleven hours after the melee at the apartment and was extracted by one of the officers who had been present at the apartment, Officer Eason. Eason was described by Officer Smith, a fellow officer, as "a rapist, possible murderer... [and] extortionist." Eason too was later fired from the force. On this record, a reasonable person in Jones' position would have been not merely fearful, but terrifiedfor days, weeks, or even months after the incident.
Both Jones and Hammonds testified at the suppression hearing and trial in 1981 (long before Officer Smith came forward in 1997) that they had been beaten by police at the scene and at the Police Memorial Building. Jones stated that he was beaten at the scene, on the way to the station, upon arrival at the station, and then was taken to a room upstairs where he was kneed in the groin and struck in the testicles with a pipe. He stated that he signed the confession only because he was in fear for his life. This statement is consistent with the testimony of Officer Smith: "[Mundy] says his intention was to kill somebody...."
Hammonds testified that he gave a statement implicating Jones because he was in fear of the police, that officers had beaten him and threatened his life. Hammonds stated that he saw Officers Mundy and Roberts beating Jones at the station while Jones was handcuffed and unresisting. Dr. Pack, who examined Jones at the hospital four or five hours after the crime, testified that Jones had a bruised face, lacerated and bleeding ear, and swollen lip.[20]
Bill White, the Chief Assistant Public Defender in Jacksonville, testified at the present evidentiary hearing that Officer Eason (the officer who took Jones' confession) told him in the 1980s that on the night of the murder he, Eason, had to pull Mundy off Jones to stop Mundy from beating him. This testimony fits perfectly with Officer Smith's account:
Q. What did did Officer Mundy tell you about Leo Jones?
A. We, we talked about it several times. He told me that he kicked in a door and that he just started beating people. He says his intention was to kill somebody, and that another officer stopped him from doing it.
I am unable to concludebased on the present recordthat Jones' confession was *535 "uninfluenced by fear."[21] If the confession were suppressed, the record evidence remaining would probably be insufficient to sustain a conviction against Jones.[22] In fact, the remaining evidence would be more consistent with Schofield's guilt than with Jones' guilt.[23] Even if the confession were not suppressed, Jones would probably be acquitted on retrialagain, based on the present recordin light of Officer Smith's testimony and the copious testimony implicating Schofield in the killing. Most of that testimony would be admissible either for substantive purposes or to impeach the testimony of Schofield and Officers Mundy and Eason.

VI. CONCLUSION
The trial court's order denying the rule 3.850 motion is fatally flawedthe trial court did not apply the right rule of law in addressing Officer Smith's testimony and its ruling is not supported by competent substantial evidence. Officer Smith's testimonyas well as much of the eyewitness and inmate testimony implicating Schofieldmeets both prongs of the Hallman and Jones tests for newly discovered evidence and thus warrants a new trial.
A new trial is required in the present case so that both sides can present all admissible evidence. An impartial judge and a jury of twelve Florida citizens should be given an opportunity to evaluate this evidence and base its decision upon the total picture rather than upon an incomplete representation. Regardless of the outcome, the cause of justicei.e., the search for the truthcan only profit:
The very essence of judicial trial is a search for the truth of the controversy. When the truth is discovered, the pattern for dispensing justice is obvious. All that we are importuned to do at this time is to open the way for the trial court to examine and correct its record with reference to a vital fact not known to the court when the judgment of conviction was entered. Due process and equal protection are governed by rule of Court, the criteria by which it is determined being fairness, reasonableness and justice.
Ex parte Welles, 53 So.2d 708, 711 (Fla.1951). I would reverse the trial court's order denying rule 3.850 relief and order a new trial.
The collateral process in Florida's capital sentencing scheme is a constitutional safety net designed above all to prevent the execution of an innocent man or woman. The present case is a classic example of that safety net working properlyup to the present point. Although Jones was tried and convicted in 1981, much of the present evidence did notcould notcome to light until now, more than a decade laterafter Officer Smith and Schofield's accusers came forward. This evidence vastly implicates Schofield and casts serious doubt on Jones' guilt. The case *536 that stands against Leo Jones today is a horse of a different color from that which was considered by the jury in 1981. "[F]airness, reasonableness and justice"and indeed, the integrity of Florida's capital sentencing schemedictate that a jury consider the complete case.
NOTES
[1] Jones was the petitioner in Jones v. State, 701 So.2d 76 (Fla.1997), petition for cert. filed, (U.S. Jan. 20, 1998) (No. 97-7646), wherein this Court found that the electric chair, in its present condition, does not constitute cruel or unusual punishment.
[2] Jones was also denied federal habeas relief on his claim that the confession was obtained in violation of his Sixth Amendment right to counsel. See Jones v. Dugger, 928 F.2d 1020, 1027 (11th Cir.1991).
[3] Hammonds implicated Jones in statements he made to police on the morning of the arrest. At the suppression hearing, Hammonds denied seeing Jones with a rifle that night. At trial he again contradicted himself and testified that he saw Jones with a rifle, and when impeached with his earlier statement, testified that he lied at the suppression hearing because he was afraid of Jones' family. At the 1992 3.850 hearing, Jones proffered an affidavit by Hammonds wherein Hammonds disavowed his trial testimony that he had seen Jones with a rifle that night, and stated that he only told police he had seen Jones with a rifle after they had beaten him. The trial court and this Court did not consider this recantation to be newly discovered evidence because Hammonds had been impeached at trial with his statements at the hearing on the motion to suppress: "Hammonds' affidavit simply offer[ed] nothing new." Jones v. State, 678 So.2d 309, 313 (Fla.1996).
[4] Jones raises two other issues on appeal that we find to be without merit: (1) the trial court reversibly erred in limiting the scope of the examination of two witnesses, and (2) the trial court erred in refusing to draw an inference in favor of Jones based on Schofield's initial invocation of the Fifth Amendment privilege against self-incrimination before later testifying in the hearing.
[5] Rule 3.850 was amended effective January 1, 1994, to reduce the time from two years to one year for filing a motion for collateral relief after a death sentence has been imposed. See Mills v. State, 684 So.2d 801, 805 n. 7 (Fla.1996).
[6] The dissents refer to the testimony of Bill White, an assistant public defender who represented Jones in his clemency proceeding. White testified that Officer Eason told him, during the course of litigation on an unrelated case, that after the murder he had to pull Mundy from Jones to stop Mundy from beating Jones. However, White first learned of this information in the 1980s, and although White filed an affidavit in this case in 1991, Jones' lawyers never presented his testimony regarding Officer Eason until this most recent hearing. White's testimony actually establishes that he, as one of Jones' attorneys, was aware of allegedly exculpatory testimony in the 1980s that might have called into question the voluntariness of Jones' confession, but failed to act upon it until 1997. Jones has not demonstrated any reason for not previously presenting this evidence and, accordingly, it is procedurally barred. Even if we were to consider this hearsay testimony, while it partially corroborates Smith's testimony, it would not be admissible to impeach Mundy.
[7] We reject Jones' argument that we must consider all testimony previously heard at the 1986 and 1992 evidentiary hearings, even if the testimony had previously been found to be barred or not to qualify as newly discovered evidence. We consider only that evidence found to be newly discovered.
[8] In connection with Jones' ineffective assistance of counsel claim in 1986, Marion Manning, one of Glen Schofield's girlfriends, testified that shortly after the shots Schofield jumped in her car and told her to drive away. When he got in the car, however, he told her that Jones had just "shot a guy." See Jones v. State, 528 So.2d 1171, 1174 (Fla.1988).
[9] Frank Pittro, Franklin Delano Prince, and Donald Perry.
[10] Additionally, as previously discussed, Schofield testified only at the most recent hearing and not at any prior proceedings. Thus, there was no prior testimony from Schofield that could be considered "[i]nconsistent with the declarant's testimony" and admissible as non-hearsay substantive evidence under section 90.801(2)(a), Florida Statutes (1997).
[11] The State argues that these statements should not even be considered as newly discovered impeachment evidence because Schofield was available at the prior evidentiary hearing but was not called to testify. While we have considered the argument that the confessions are procedurally barred, because the number of total confessions may be relevant to the issue of the trustworthiness of the confessions, we consider them here for that purpose. See Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973).
[12] As noted in Justice Shaw's dissent, Judge Johnson's order does not analyze Smith's testimony under Brady nor fully address Smith's testimony as newly discovered evidence. However, accepting Smith's testimony as true, the record is adequately developed for us to analyze Jones' claims pertaining to Smith's testimony.
[13] Although the majority concludes that the evidence against Glen Schofield merely infers that Jones and Schofield acted together, the record reflects that the State has never advanced such a theory and, moreover, the same record reflects the complete absence of evidence indicating such a scenario.
[14] In his sworn testimony Smith explained in detail how officers were "discouraged" from complaining about the misconduct of other police officers.
[15] The following is a list and rough summary of the exculpatory evidence that Jones relies on in seeking a new trial:

1. Leo Jones' own testimony: Not guilty; guns found at his apartment belonged to Schofield; confession was involuntary and product of physical coercion.
2. Bobby Hammonds' testimony: Schofield was in Jones' apartment that night shortly after midnight; left carrying a gun; recants any testimony implicating Jones.
3. Marion Manning's testimony: Schofield's girlfriend; shortly after the shots Schofield jumped in her car and told her to drive away; he was acting nervous; but when he got in the car he told her that Jones had just shot "a guy."
4. Paul Marr's testimony: Housed with Schofield at Union Correctional Institution; Schofield confessed to him that he committed the murder.
5. Alberta Brown's testimony: Testified that Marion Manning told her in 1981 that she picked up Schofield on the night of the murder and that he had a rifle with him.
6. Patricia Owens Ferrel's testimony: Schofield was not with her that night but asked her to provide an alibi for him; Schofield later made equivocal statement that he was guilty.
7. Frank Pittro's testimony: Housed as inmates together at Union Correctional Institution; Schofield told him that he committed the murder.
8. Denise Reed's testimony: Saw Schofield running away from the general area of the crime scene with a rifle right after the murder.
9. Daniel Cole's testimony: Saw Schofield running away from the general scene of the crime with a rifle.
10. Franklin Prince's testimony: Housed with Schofield at Union Correctional Institution; in the presence of others Schofield confessed to him that he committed the murder.
11. Donald Perry's testimony: Housed with Schofield at Lake Butler; Schofield confessed to the murder and using a .30-30.
12. Roy "Shorty" Williams' testimony: Claimed he was "partners" with Schofield; saw him on the night of the murders bending down in the bushes aiming at Officer Szafranski; did not see the muzzle flash; said Officer Szafranski was at the murder scene for many minutes (around fifteen) writing a report before he was shotthis was completely inconsistent with Officer Wilmoth's testimony who was at the scene and testified that Officer Szafranski just pulled up to the stop sign and was shot.
13. Dwayne Hagans' testimony: Housed with Schofield at Union Correctional Institution; testified that Schofield was in the area the night of the murder and that Schofield wanted some money to get out of town; Schofield asked him to "hold down" his rifle; Schofield told him on three subsequent occasions that he killed Officer Szafranski.
14. Glen Schofield's testimony: Denied knowing Jones, except involved in heroine purchase at Jones' apartment that night; denied knowing Szafranski, or being guilty of his murder.
15. James Corbett's testimony: Testified that he saw Schofield on the porch of Jones' building with a rifle about an hour before the shooting; he heard the shots and then saw Schofield running away from the scene of the crime with a bat or rifle.
16. Jasper Kirtsey's testimony: Housed with Schofield at Lake Butler facility; Schofield told him he killed Officer Szafranski over money because he was a dirty cop.
17. Lamarr McIntyre's testimony: Housed together at Union Correctional Institution; Schofield told him he committed the murder because the "police was taking dope or they was setting up, playing like they was taking dope, and he wasn't going to have nobody taking his dope or something to that effect."
18. Carnell Grayer's testimony: Housed with Schofield at Cross City; Schofield confessed to the murder with a .30-.30. Schofield told him he killed Officer Szafranski because he was "f* * * * with him."
19. Louis Reed's testimony: Housed with Schofield at Cross City Correctional Institution; Schofield confessed to the murder with a .30.30; Schofield claimed he threw the murder weapon in the Jacksonville river.
20. Officer Cleveland Smith's testimony: Testified that Officer Mundy told him that he entered Jones' apartment the night of the murder and started beating "the guy [police] put in jail"; said Mundy had a reputation as an enforcer and that he had witnessed Mundy extract a confession by putting vice grips on a suspect's genitals; testified that Mundy would falsify reports; testified that prior to murder officers were all told to "get" Jones because he had been in a fight with another officer.
21. Bill White's testimony: A public defender who had previously represented Jones, testified that Officer Hugh Eason, the officer who took Jones' confession, told him that he had to pull Mundy off Jones in order to make him stop beating him.
[16] See, e.g., Green v. Georgia, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979); Rivera v. Director, Department of Corrections, 915 F.2d 280 (7th Cir.1990); Wilkerson v. Turner, 693 F.2d 121 (11th Cir.1982); United States ex rel. Gooch v. McVicar, 953 F.Supp. 1001 (N.D.Ill.1997); People v. Anderson, 291 Ill.App.3d 843, 225 Ill.Dec. 854, 684 N.E.2d 845 (1997); People v. Wilson, 271 Ill.App.3d 943, 208 Ill.Dec. 716, 649 N.E.2d 1377 (1995); Lacy v. State, 700 So.2d 602 (Miss. 1997).
[17] The quantity and quality of Schofield's confessions fare even better when compared to the single and unusually bare-boned statement given by Jones.
[18] Contrary to what the trial court states in its order, nowhere in his testimony did Officer Smith testify that Mundy said he wanted to put Jones in jail.
[19] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[20] In counterpoint to the testimony of Jones and Hammonds, the State presented Officers Mundy, Roberts, and Eason. Mundy and Roberts testified that Jones and Hammond resisted arrest and that neither was hit after he had been subdued and handcuffed and neither had been threatened at any time. Eason stated that he recalled only minimal injuries to Jones when he interviewed him prior to the confession. Dr. Pack testified that Jones' injuries were superficial; the neurological exam for head trauma and x-rays of the skull, face, and ribs were negative.
[21] It is not dispositive, in my opinion, that Jones had no broken bones or concussions when examined at the hospital or that he had not been hit for several hours before he confessedfacts upon which the majority appears to place considerable weight.
[22] None of the remaining evidence in the record shows conclusively that Jones committed the crime. The physical evidence includes the following: The trajectory of the bullet indicates that it came from the building where Jones and Schofield shared an upstairs apartment; the windowsill of a downstairs apartment allegedly had a recoil mark (according to Mundy); two rifles were found under a bed in the Jones/Schofield apartment moments after the shooting (Jones testified that the guns were Schofield's), each is the make and caliber of the murder weapon, Jones' fingerprint was found on one and the other has been ruled out as the murder weapon (but the one with the print cannot be conclusively identified as the murder weapon). Additionally, Jones allegedly made a remark to an officer days before the shooting that he was tired of the police hassling him, that they were not the only ones with guns, and that "he was going to shoot... a pig." (Jones claims that he never made the remark, that the police fabricated it.) Although Hammonds gave a statement hours after the crime implicating Jones, he too had been subjected to extraordinarily coercive influences and has since changed his story many times.
[23] As noted above, numerous eyewitnesses have placed Schofield at the scene carrying a gun, and he has told many people that he killed Officer Szafranski. In contrast, no one has placed Jones at the scene carrying a gun (except Hammonds, as explained above), and Jones has told no one (except Eason) that he killed the officer.