PER CURIAM.
This case is before the Court on appeal from an order denying Thomas James *721 Moore’s second successive motion to vacate his judgment of conviction for first-degree murder and sentence of death, filed pursuant to Florida Rule of Criminal Procedure 3.851. Because the order concerns postconviction relief from a capital conviction for which a sentence of death was imposed, this Court has jurisdiction of the appeal under article V, section 3(b)(1), of the Florida Constitution. For the reasons set forth below, we affirm the denial of postconviction relief.
FACTS
The facts were summarized by this Court on direct appeal as follows:
Moore [who was nineteen years old at the time of the crime] was convicted of robbing and killing Johnny Parrish — an adult resident of his neighborhood — and burning down Parrish’s house. The two were friends, and Moore occasionally visited Parrish’s home. On January 21, 1993, at about 3 p.m., Moore sat outside Parrish’s house drinking with the victim. Moore claims that two other youths, Clemons and Gaines, approached the house. Moore claimed he saw the pair chase a neighborhood youth named “Little Terry” with a gun earlier that day, but Clemons denied it at trial. Clemons and Gaines testified that they had a conversation with Moore about robbing Parrish. Clemons said he agreed to go in the house with Moore, and Gaines was to be the lookout. Gaines said he stood outside but did not see either man go in. He said he heard two shots and then saw Clemons come out of the house and go back in. When Gaines started to walk away, Clemons caught up with him and told him Moore had shot Parrish.
Clemons said that when he and Moore went into the house, Moore pulled out a gun. Moore asked Parrish where his money was and then shot him when he got no response. Later, neighbors saw smoke in Parrish’s house and ran in and pulled out Parrish. Parrish was already dead when exposed to the fire, and a fire investigator, Captain Mattox, said that there were two separate fires in the house, both of which were intentionally set.
A witness named Shorter testified that Moore brought him a bag of clothes and asked him to burn them. Shorter also testified that Moore told him he had shot Parrish and set fire to the house. Shorter stated that Moore said he shot Parrish twice, that Clemons ran out of the house, and that Moore took the top off a lawn mower he found and set it on fire to clean the house of fingerprints. Shorter did not call the police but did call his mother, who called the police.
A jail inmate, Jackson, testified that Moore told him that he did not mean to kill Parrish but had to because Parrish would recognize him. Another neighbor, Dean, testified that Moore asked him to rob Parrish.
At the penalty phase, the State submitted evidence of Moore’s prior convictions of armed robbery and aggravated battery. Also, the State called Parrish’s daughter for “victim impact evidence” limited to the fact that Parrish was a good man. The defense called Moore’s mother, who testified that Moore was a bright child who had been troubled because his father, who had died when Moore was young, was married to another woman. Other family and friends testified that Moore had been a good student and a polite young man.
Moore v. State, 701 So.2d 545, 547-48 (Fla.1997). The jury convicted Moore of first-degree murder, among other crimes, and, after hearing the evidence presented in the penalty phase, recommended death by a vote of nine to three. The trial court *722 sentenced Moore to death, finding three aggravators: (1) a prior violent felony; (2) the murder was committed to avoid arrest; and (3) the murder was committed for pecuniary gain.
Moore subsequently filed an initial post-conviction motion, which was summarily denied. This Court affirmed the denial of postconviction relief and denied his petition for a writ of habeas corpus. See Moore v. State, 820 So.2d 199 (Fla.2002). After the United States Supreme Court issued its decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), Moore filed a successive postconviction motion arguing that he was entitled to relief under Ring. This Court affirmed the denial of relief. Moore v. State, 886 So.2d 227 (Fla.2004) (table decision). Moore filed two additional petitions for a writ of habeas corpus, both of which were denied. Moore v. Crosby, 923 So.2d 1163 (Fla.2005) (table decision); Moore v. Crosby, 900 So.2d 554 (Fla.2004) (table decision).
Moore then instituted this second successive postconviction motion, raising three claims: (1) the State intentionally presented false evidence at trial with regard to witness Randy Jackson; (2) Moore is entitled to a new trial based on Brady,[1] Giglio[2], ineffective assistance of counsel, and newly discovered evidence, which establishes that Moore is innocent because Moore’s codefendants confessed to other juvenile inmates that Carlos Clemons killed the victim and blamed Moore, who was not even present; and (3) Moore’s conviction violates due process, as newly discovered evidence establishes Moore’s innocence. Moore amended his second successive postconviction motion numerous times.
The postconviction court held an eviden-tiary hearing, during which both defense counsel and the State presented witnesses in support of their respective positions. After the postconviction court denied relief, Moore appealed to this Court. Based upon a thorough examination of the record and having fully reviewed the arguments of the parties, we reject all of the issues raised by Moore and affirm the postconviction court’s denial of relief.
ANALYSIS
In this appeal, Moore raises two claims: (1) the State knowingly presented false or misleading evidence that it failed to correct at Moore’s trial in violation of Giglio; and (2) newly discovered evidence establishes that Moore is innocent.[3] Pursuant to Florida Rule of Criminal Procedure 3.851, any motion to vacate a judgment of conviction and sentence of death shall be filed within one year after the judgment becomes final. Fla. R.Crim. P. 3.851(d)(1). As this case concerns a successive postcon-viction motion filed more than one year after Moore’s conviction and sentence became final, in order for this motion to be considered, the successive postconviction motion must allege one of the following three exceptions to the one-year time bar:
(A) the facts on which the claim is predicated were unknown to the movant or the movant’s attorney and could not have been ascertained by the exercise of due diligence, or
*723 (B) the fundamental constitutional right asserted was not established within the period provided for in subdivision (d)(1) and has been held to apply retroactively, or
(C) postconviction counsel, through neglect, failed to file the motion.
Fla. R.Crim. P. 3.851(d)(2). Based on the claims raised, Moore relies on rule 3.851(d)(2)(A), the newly discovered evidence subsection. We address each claim in turn.
I. Giglio Violations
As his first claim on appeal, Moore contends that the postconviction court erred in denying relief pertaining to certain alleged Giglio violations. Specifically, Moore asserts that the State committed Giglio violations as to three witnesses: (1) the State knowingly presented false evidence pertaining to witness Jackson by using incorrect information during the trial itself; (2) the State permitted codefendant Clemons to present false testimony at Moore’s initial trial when it failed to correct his testimony that he did not have a plea deal with the State at the time of trial; and (3) the State knowingly presented false testimony that codefendant Vincent Gaines did not chase Terry Ashley (“Little Terry”) with a gun shortly before the crime. The State contends that all of these claims are untimely, or in the alternative, without merit. We review each alleged Giglio violation individually.
A. Giglio Claim Pertaining to Jackson
As an initial matter, the State alleges that Moore’s Giglio claim pertaining to witness Jackson is untimely because it is based upon facts that were known to Moore and Moore’s counsel at the trial itself, and thus, this claim does not satisfy the exception in rule 3.851(d)(2)(A). Moore does not contest that this claim is untimely, but alleges that to the extent that his trial counsel did not realize this error, Moore was denied the effective assistance of trial counsel, and since postcon-viction counsel did not raise an ineffective assistance of counsel claim in the initial postconviction motion based on this error, Moore was also deprived of effective assistance of postconviction counsel and is entitled to relief under Martinez v. Ryan, _ U.S. _, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012).
The record pertaining to this subclaim reflects that during the trial, the State called Jackson, who testified that he was friends with Moore and that at one point while Moore and Jackson were incarcerated with each other, Moore admitted that he killed the victim. On cross-examination, in an attempt to demonstrate that Jackson had a motive to testify falsely against Moore, Moore’s counsel elicited information from Jackson that Jackson and Moore had an altercation prior to the alleged confession. The State then questioned Jackson during redirect, asking him whether he and Moore were involved in a battery against another man, Timothy Brinkley, after this altercation with each other. The State also asked Moore himself about the order of these events, and Moore agreed that the State’s time frame sounded correct to him.
Moore now asserts that the State knowingly presented false evidence because Moore and Jackson first committed the battery upon Brinkley, and subsequently, Jackson and Moore had a physical altercation with each other. The postcon-viction court denied this claim, holding that the claim was procedurally barred because “[t]he facts ... were readily available to trial counsel at the time of trial, as they were contained in police reports which existed in 1991. Further, there is no reason why this claim could not have *724 been raised in the Defendant’s first post-conviction motion.” We affirm this ruling.
During the trial, the State questioned both witness Jackson and defendant Moore as to the chronological order of the battery and the altercation. ■ Both witnesses agreed with the State’s erroneous timeline of the incidents that indicated the altercation occurred before the battery. However, the correct information that the battery preceded the altercation was available to defense counsel during the trial, as well as to the defendant himself since Moore had direct knowledge of the events in which he was involved. Neither trial counsel nor initial postconviction counsel raised this issue. Thus, as this claim was based on information that the defendant and defense counsel had at the time of trial, the claim is procedurally barred. See Byrd v. State, 14 So.3d 921, 926-27 (Fla.2009) (holding that the defendant’s Giglio claim was procedurally barred where it was based on a 1981 police report that was provided to trial counsel prior to trial); Jimenez v. State, 997 So.2d 1056, 1070 (Fla.2008) (holding that the defendant’s Giglio claim was procedurally barred because it was based entirely on a pretrial deposition that defense counsel possessed and was not based on newly discovered evidence).
Further, this Court has not recognized a claim of ineffective assistance of postconviction counsel, see Kokal v. State, 901 So.2d 766, 777 (Fla.2005), and has rejected the claim that Martinez, 132 S.Ct. 1309, creates a new and independent cause of action for ineffective assistance of collateral counsel in our state courts’ system. See Gore v. State, 91 So.3d 769, 778 (Fla.), cert. denied, _ U.S. _, 132 S.Ct. 1904, 182 L.Ed.2d 661 (2012).
Moreover, even if the claim had been timely raised, Moore is not entitled to relief. In order to establish a Giglio violation, it must be shown that: (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material. Guzman v. State, 868 So.2d 498, 505 (Fla.2003). The evidence is considered material “if there is any reasonable possibility that it could have affected the jury’s verdict.” Tompkins v. State, 994 So.2d 1072, 1091 (Fla.2008) (quoting Rhodes v. State, 986 So.2d 501, 508-09 (Fla.2008)). “The State, as the beneficiary of the Giglio violation, bears the burden to prove that the presentation of false testimony at trial was harmless beyond a reasonable doubt.” Guzman, 868 So.2d at 506. Giglio claims present mixed questions of law and fact. This Court defers to those factual findings supported by competent, substantial evidence, but reviews de novo the application of the law to the facts. Green v. State, 975 So.2d 1090, 1106 (Fla.2008).
Assuming that Moore was able to establish the first two prongs of Giglio, he nevertheless cannot show that the evidence is material, that is, that there was “any reasonable possibility that it could have affected the jury’s verdict.” Tompkins, 994 So.2d at 1091 (quoting Rhodes, 986 So.2d at 508-09). The erroneous information presented at trial involved the issue of whether Jackson may have had a personal motive to provide false testimony against Moore because the two had a prior fight or whether Jackson and Moore had repaired their friendship after this incident and together committed a battery against Brinkley. However, the information provided a possible ground for questioning the credibility of only Jackson. The State also presented testimony from another unrelated witness, Chris Shorter, who heard Moore confess on multiple occasions and discuss significant details regarding the murder. In addition, Moore’s codefendant Clemons testified that he witnessed Moore *725 shoot the victim, and codefendant Gaines testified that he saw Clemons and Moore walk into the victim’s home shortly before the shooting. After a full review of the evidence presented at trial, we conclude that there was no reasonable possibility that this error in the chronological order pertaining to the battery on Brinkley and the altercation between Moore and Jackson could have affected the jury’s verdict. Therefore, we deny relief on this subclaim.
B. Giglio Claim Pertaining to Clemons
In the next alleged Giglio violation, Moore contends that the State violated Giglio because the State failed to correct codefendant Clemons’ false testimony at trial when Clemons stated that he did not have a plea deal with the State at the time of trial. In support, Moore asserts that during the postconviction evidentiary hearing, Clemons admitted that he had a plea agreement with the State at the time of trial. As this subclaim rests on allegedly newly discovered evidence that Moore did not obtain until this proceeding, we address this claim on the merits. However, after a full review of the trial record and the testimony presented at the postconviction evidentiary hearing, we disagree that the record shows such an admission from Clemons.
To the contrary, the record from trial reflects that Clemons initially entered into a plea bargain with the State, agreeing to testify against Moore in exchange for the opportunity to plead to second-degree murder and be sentenced as a juvenile. Days before Moore’s trial, however, Moore’s attorney objected to the plea agreement between Clemons and the State, notifying the parties and the court that the plea deal was illegal. Based on this issue, Clemons was permitted to withdraw his guilty plea, so at the time of Moore’s trial, no plea deal was in place.
At Moore’s trial, the State called Clemons to testify and then questioned Clemons as to the former plea agreement, at which point Clemons informed the jury that he had previously agreed to testify against Moore in exchange for juvenile sanctions, but the plea agreement was found to be illegal. On cross-examination, Moore’s defense counsel attacked Clemons’ credibility, at which time Clemons recognized that he had been involved in other prior criminal activity and even lied to the police, letting a different person take “the rap” for him in order to avoid punishment. In addition, defense counsel questioned Clemons about his motive in testifying against Moore, as well as about Clemons’ desire to obtain an equally generous plea deal as the one that he had been previously promised.
Moore alleges that during the evidentia-ry hearing pertaining to the second successive motion for postconviction relief, Clemons acknowledged that a secret plea agreement was in place at the time of Moore’s trial. However, the record does not support Moore’s allegations. In denying relief, the postconviction court noted that the testimony at the evidentiary hearing was ambiguous and that “when Mr. Clemons testified regarding his plea agreement, he was never asked to clarify whether he was referring to the plea agreement entered into before or after the Defendant’s trial.” We agree.
With respect to this Giglio claim, Moore failed to meet his burden to demonstrate that the State knowingly presented false testimony at trial when Clemons testified that there was no valid plea agreement in place at the time of trial. The testimony at the evidentiary hearing pertaining to this claim was not specifically addressed to only the narrow window of time during which Clemons did not have a *726 plea agreement in place with the State at the time of the trial. Instead, the postcon-viction evidentiary hearing testimony simply established that Clemons had a plea deal “in this case” and had initially agreed to testify against Moore in exchange for a very lenient sentence that did not require a prison term and would permit Clemons to be sentenced as a juvenile.
Moreover, even if Clemons’ statement at the evidentiary hearing could be interpreted to mean that a valid plea deal existed at the time of Moore’s trial, the statement pertaining to the plea deal would not be material because there is no reasonable possibility that it could have affected the jury’s verdict. See Tompkins, 994 So.2d at 1091. During the trial, Clemons candidly discussed that the State had offered him a very favorable plea agreement and admitted that he was hoping that the State would offer a similar plea agreement to him in the future. Accordingly, the jury was aware that Clemons was initially offered extremely favorable terms in the initial plea agreement and further knew that Clemons was attempting to curry favor with the State in hopes that the State would offer the same terms to him again once the legality of the prior plea agreement had been resolved. This posture could provide an even greater incentive for Clemons to testify favorably for the State than simply having a deal in place. In addition, during Moore’s trial itself, defense counsel performed a thorough job of impeaching Clemons’ credibility, eliciting information that Clemons had previously lied to the police and permitted codefendant Gaines to take the rap for him in another criminal matter because he did not want to be punished. Accordingly, we deny relief on this subclaim.
C. Giglio Claim Pertaining to Gaines
In Moore’s final alleged Giglio violation, he contends that the State violated Giglio by knowingly presenting false testimony that codefendant Gaines did not chase Little Terry with a gun shortly before the crime. In support, Moore relies on a statement from the postconviction eviden-tiary hearing where Gaines admitted that he did chase Little Terry, but still denied having a gun. We first review facts relating to this claim.
At Moore’s trial, the issue of whether Clemons possessed a gun on the day of the murder was critical to the defense. During cross-examination, defense counsel asked Gaines whether he was at Grand Park with Clemons around noon on the day of the murder and whether he saw Clemons with a gun in his possession. Gaines denied both allegations and further testified that he did not remember seeing Little Terry that day. However, Clemons testified at trial that he thought he and Gaines had seen Little Terry before the murder and chased him, but Clemons denied having a gun. Little Terry also testified, asserting that he saw Clemons and Gaines around 10:30 a.m. that day and ran away when he thought one of them was reaching down to his side for a gun. At the evidentiary hearing, Moore’s counsel questioned Gaines about his interactions with Little Terry, at which point Gaines testified that he remembered chasing Little Terry with Clemons, but could not recall whether this happened on the same day as the murder. Gaines explicitly denied having a weapon on him when the chase occurred.
We affirm the denial of relief as to this subclaim because Moore has failed to establish that a Giglio violation occurred. In order to establish a Giglio violation, the defendant must first establish that the testimony given was false. Guzman, 868 So.2d at 505. The testimony at trial clearly showed that the evidence was in dispute *727 as to whether either Clemons or Gaines saw Little Terry on the day of the murder. Gaines testified at trial that he could not recall whether he saw Little Terry that day. During the evidentiary hearing in this case, Gaines testified that he and Clemons chased Little Terry, but still could not recall whether this occurred on the day of the murder. Thus, Moore has failed to show that false testimony was presented at trial. Likewise, Moore has failed to establish that the State knew the testimony was false — the second requirement to establish a Giglio violation. See Guzman, 868 So.2d. at 505. Accordingly, we deny this subclaim.
II. Newly Discovered Evidence
Moore next asserts that he is entitled to postconviction relief because newly discovered evidence establishes that he is innocent. In order to obtain relief based on a newly discovered evidence claim, Moore must demonstrate both that (1) “the evidence must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence”; and (2) the evidence “must be of such nature that it would probably produce an acquittal on retrial.” Mungin v. State, 79 So.3d 726, 738 (Fla.2011) (alteration in original) (quoting Jones v. State, 709 So.2d 512, 521 (Fla.1998)). “In making this determination, a trial court must ‘consider all newly discovered evidence which would be admissible at trial and then evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial.’” Id. (quoting Jones, 709 So.2d at 521). Where the postconviction court’s factual findings and credibility determinations are supported by competent, substantial evidence, this Court will defer to its findings because the postcon-viction court has a “superior vantage point in assessing the credibility of witnesses and in making findings of fact.” Porter v. State, 788 So.2d 917, 923 (Fla.2001). We address each of Moore’s allegations pertaining to this claim in turn.
A. Newly Discovered Evidence
Regarding Codefendants’ Admissions in the Juvenile Pod
Moore first asserts that he is entitled to relief after recently discovering evidence showing that Clemons and Gaines made various statements while in the juvenile pod shortly after their arrests that Moore was not involved in the murder. In support, during the postconviction eviden-tiary hearing, Moore’s counsel called numerous witnesses who were incarcerated with Clemons and Gaines.
David Hallback, Jr., testified at the evi-dentiary hearing, stating that when he was around fourteen years old, he was incarcerated with Clemons. Hallback knew Moore because Moore is his first cousin, and he also knew Clemons because they both attended the same school. According to Hallback, Clemons was brought to the juvenile facility around January 1993, and they immediately recognized each other from school. That evening, they each talked about their individual cases. During this conversation, Clemons said that Moore was the victim’s best friend and the two always hung out together. According to Hallback, Clemons and Gaines had to wait for Moore to leave before committing the crime because Moore would not have let them “do that.” Clemons and Gaines went back to the victim’s house because they knew that there was a safe in the victim’s house and the victim sold moonshine.
On cross-examination, Hallback testified that he was Moore’s first cousin and had told his grandmother about the conversation with Clemons immediately after it oc *728 curred. Shortly after he informed his grandmother about this conversation, someone affiliated with the public defender’s office visited him and asked about the conversation between Hallback and Clemons. According to Hallback, this person told Hallback not to discuss the information with anyone else, so Hallback waited until he was contacted by defense counsel during the current postconviction proceedings.
At the evidentiary hearing, Moore also presented the testimony of three other inmates who were housed in the juvenile pod and heard incriminating statements from Moore’s codefendants. Mandell Rhodes testified that he was incarcerated at the juvenile detention center in 1993 when he was fifteen years old. Clemons and Gaines were in the same pod as Rhodes. Clemons talked about his charge, asserting that he was the one who did “it,” but did not explain this statement further. Clemons did state that he was going to blame the crime on Moore, who was the oldest person, because the State had given Clemons an escape since he was the youngest and was misled. Rhodes was also told that they had used a chrome handgun, but Rhodes did not know the caliber.
Raimundo Hogan testified that in 1993, when he was sixteen years old, he was at the juvenile facility when Clemons and Gaines were in custody. Hogan testified that he was friends with Gaines, but did not know Moore. Gaines initially told Hogan that he and Clemons robbed a person and a man got killed. A few days later, Gaines spoke more in depth, saying that Clemons shot the victim with a .38, but they were going to blame the crime on someone else. Gaines then explained that they did not have a choice and the person they were going to blame was a “nobody,” meaning that he did not have family or friends that would get some “get-back” when they blamed him for the crime. Hogan later asked Clemons about the crime, and Clemons admitted that he shot the victim and that he was going along with Gaines and blaming the crime on Moore. Gaines also said that the gun that was used had been stolen from a black Mustang. On cross-examination, Hogan, who has since been convicted of more than twelve felonies, stated that he never told his defense attorney about this conversation because it was not his business.
Finally, Moore called Charles Simpson, who testified that in 1993, he was incarcerated with Clemons in the juvenile pod when Simpson was around sixteen years old. Simpson knew Clemons because they went to school together and while in the juvenile pod, Clemons admitted that the “older guy took the rap” for the murder but did not provide any details. Simpson stated that he saw Clemons on the street with a gun when Clemons pulled a chrome .38 on Terrance Jennings about a day before the murder. On cross-examination, Simpson testified that he had been convicted of two prior felonies and a misdemeanor charge relating to theft. Although he asserted that he knew Clemons shot the victim, he did not know whether Moore was a principal in the case.
In response, the State called Clemons and Gaines. According to Clemons, when Clemons was thirteen, Moore asked Clemons to go into Parrish’s house with him and while they were inside, Moore shot and killed Parrish, Clemons denied having a gun, denied telling anyone that he was setting up someone else, and denied telling anyone that he stole a gun from a Mustang. Based on his involvement in the murder, Clemons pled guilty to manslaughter, but never violated the terms of his community control and has not been convicted of any felonies or crimes involv *729 ing dishonesty since then. He farther denied that he committed the murder or that he ever told anyone that Moore was innocent.
Gaines was the last witness called. He had agreed to testify truthfully at Moore’s trial in exchange for a plea deal. He admitted to being the lookout, but asserted that he never told anyone that he and Clemons committed the crime by themselves or that Moore was innocent. Gaines further denied that he told anyone that he had lied regarding Moore’s involvement in the crime. He asserted that Moore approached Clemons and Gaines about helping with a robbery. Gaines was the designated lookout, but he started walking away when it began to rain and the woman next door kept watching him. Clemons came running out of the house shortly after that and caught up with him. Gaines denied telling anyone that Clemons went into the house with a gun.
The postconviction court carefully considered the testimony of all of the witnesses, recognizing that the testimony presented at the evidentiary hearing created a conflict as to whether Clemons and Gaines even made the reported statements while in the juvenile pod. The court first examined the evidence as it pertained to Clemons, resolving this conflicting evidence as follows:
In support of [Moore’s newly discovered evidence] claim, the Defendant presented the testimony of David Hallback. Mr. Hallback testified that in 1993, when he was about fourteen years old, he was incarcerated with Mr. Clemmons.[4] Mr. Hallback testified that Mr. Clemmons told him that the Defendant did not have anything to do with the crime. Mr. Hallback testified that he told this information to a defense investigator, Dan Ashton, a few years ago. On cross-examination, Mr. Hallback stated that he had been convicted of three armed robbery charges. Mr. Hallback is the Defendant’s first cousin. Mr. Hallback testified that, at the time the Defendant was facing these charges, he told a representative of the Public Defender’s Office that the Defendant was innocent, but that they never got back in touch with him. Mr. Hallback waited all these years for the Public Defender’s Office to get back in touch with him. Mr. Hall-back testified that the next time he told this information to anyone was when Mr. Ashton contacted him a few years ago. With regard to Mr. Hallback’s testimony, this Court finds it completely incredible that he would wait from 1993 to 2005 to inform anyone that his cousin, who was on death row, was an innocent man. As such, this Court affords no weight to Mr. Hallback’s testimony.
Aside from Mr. Hallback, ... the Defendant presented the testimony of Mandell Rhodes, an inmate at Hamilton Correctional Institution. Mr. Rhodes testified that in 1993, when he was fourteen years old, he was incarcerated with both Mr. Clemmons and Mr. Gaines. Mr. Rhodes stated that Mr. Clemmons told him “that he was the one who did it.” Mr. Rhodes characterized Mr. Clemmons’ statements as “just something to do, just something to say.” Mr. Rhodes further testified that Mr. Clem-mons said he was “going to blame it on the oldest guy.”
On cross-examination, contrary to his direct-examination, Mr. Rhodes testified that these statements occurred in 1994. When Mr. Rhodes was asked how many felonies he had been convicted of, his response was: “I couldn’t tell you. Quite a few.” Mr. Rhodes testified that *730 he went under a false name in 1993. Upon re-direct examination, Mr. Rhodes stated that he did not really know for sure when he had this conversation with Mr. Clemmons.
Second, the Defendant presented the testimony of Raimundo Hogan. Mr. Hogan testified that in 1993, when he was 16, he was incarcerated with Mr. Clemmons. He further testified that Mr. Clemmons stated that he was the one who shot the victim, and that he and Mr. Gaines were going to blame the crime on the Defendant. Mr. Hogan has been convicted of twelve armed robberies, and two or three other felonies. Mr. Hogan testified that he never told his public defender that he had information about an innocent man because it was not his business.
Third, the Defendant presented the testimony of Charles Simpson. In 1993, when Mr. Simpson was sixteen or seventeen, he was incarcerated with both Mr. Clemmons and Mr. Gaines. On direct-examination, when Mr. Simpson was asked if he ever spoke with Mr. Clem-mons about his case, Mr. Simpson’s response was: “I can’t quote him.” When asked if Mr. Simpson generally remembered what Mr. Clemmons said, Mr. Simpson stated that “the older guy took the rap.” Mr. Clemmons did not tell Mr. Simpson any specifics about anything that happened on the day of the murder. On cross-examination, Mr. Simpson testified that he had been convicted of two felonies and one misdemeanor theft. During re-direct examination, Mr. Simpson stated that he could not specifically testify as to what he was told by Mr. Clemmons, but then he clarified that it was his “understanding” that Mr. Clemmons was the shooter. Mr. Simpson then testified that Mr. Clem-mons was not going to “pin it” because it was already “pinned on the older guy.”
This Court gives absolutely no weight to Mr. Simpson’s testimony. Mr. Simpson’s testimony in no way inculpates Mr. Clemmons or exculpates the Defendant and barely qualifies as impeachment evidence. As Mr. Simpson stated several times, he could provide no specific testimony. Instead, Mr. Simpson only provided generalizations of statements that occurred numerous years ago (in 1993) that the “older guy took the rap” and that it was his “understanding” that Mr. Clemmons was the shooter. Further, it appeared to this Court that Mr. Simpson could have been under the influence, as he had difficulty providing his testimony and was difficult to understand. This Court finds that Mr. Simpson’s testimony is not credible and is inconsequential.
The State presented the testimony of Carlos Clemmons. Mr. Clemmons stated that he testified truthfully during the trial. Mr. Clemmons testified that the Defendant asked him to go to the victim’s house, that the Defendant killed the victim, and that he (Mr. Clemmons) did not have a gun on him when he went into the victim’s house. Mr. Clemmons never told anyone, between the time the victim was murdered and the 2011 evi-dentiary hearing, that he took a gun into the victim’s home. Mr. Clemmons never told anyone that the Defendant was innocent and that he was setting him up. Nor did Mr. Clemmons ever tell anyone that he and Mr. Gaines were conspiring against the Defendant. Mr. Clemmons testified that he never confided in Mr. Simpson, Mr. Dean, Mr. Rhodes, Mr. Hogan, or Mr. Hallback. Mr. Clem-mons testified that he never told Mr. Hallback that the Defendant did not commit, or have anything to do with, the murder. Mr. Clemmons had not been convicted of any felonies outside of this *731 case, nor had he been convicted of any crimes of dishonesty. Further, Mr. Clemmons appeared for his post-conviction deposition without having to be subpoenaed.
This Court, having already afforded no weight to Mr. Hallback’s or Mr. Simpson’s testimony, is left with the testimony of Mr. Rhodes and Mr. Hogan, which contradicts the testimony of Mr. Clemmons. This Court finds Mr. Clem-mons’ testimony to be more credible and persuasive than that of Mr. Rhodes or Mr. Hogan. Mr. Clemmons’ testimony was clear, concise, and in accord with his original trial testimony. Mr. Clemmons’ testimony was also consistent with the statement he gave to police on January 19, 1993, before the State Attorney’s Office was even involved with the case.
In contrast, Mr. Rhodes[’] testimony was anything but concise. Mr. Rhodes characterized Mr. Clemmons’ statements as “just something to do, just something to say.” Mr. Rhodes could not even remember when he had his conversation with Mr. Clemmons. He first testified that it occurred in 1993 and then testified that it occurred in 1994. Then Mr. Rhodes stated that he could not remember when it happened. If the conversation occurred in 1994, then it would have occurred after this case had been tried and the Defendant had been sentenced to death. Finally, this Court finds it implausible that one would have information regarding the guilt of someone on death row and then wait for over a decade to disclose this information (and, at that, only disclose it when questioned by an investigator). This Court finds it equally implausible that Mr. Hogan, a fourteen-time convicted felon, would have had information regarding the guilt of someone on death row and not tell anyone, including his own attorney, because it was not his
“business,” yet, it became his “business” over a decade later when questioned by the Defendant’s investigator.
Moreover, assuming arguendo that the Defendant’s witnesses were credible and provided persuasive impeachment evidence, the Defendant still could not meet the second prong of Jones, as this evidence would not produce an acquittal on retrial. First, the State conceded at trial that Mr. Clemmons was lacking in character. Further, during the trial, defense counsel strenuously cross-examined Mr. Clemmons, questioning him about lying to police and about the fact that Mr. Clemmons hoped to receive lenient treatment from the State in exchange for his testimony. Finally, and most importantly, there was overwhelming evidence of the Defendant’s guilt. In its Memorandum, the State thoroughly set forth the details of the evidence implicating the Defendant. In light of all these factors, there is no way that this purported impeachment testimony would produce an acquittal on retrial. As such, the Defendant’s claim of newly discovered evidence with regard to Mr. Clemmons is denied.
(Record citations and footnotes omitted.) The postconviction court then analyzed the statements pertaining to Gaines and likewise denied the claim. The court first recognized that while Moore presented testimony from both Rhodes and Hogan pertaining to Gaines, Rhodes’ testimony provided no impeachment value at all because Rhodes stated merely that Gaines bragged about the case but did not give specific details about it. Thus, the court weighed the testimony of Hogan against the conflicting testimony of Gaines, resolving this conflict as follows:
Raimundo Hogan testified that while he was incarcerated with Mr. Gaines, Mr. Gaines told him that he and Mr. *732 Clemmons robbed someone, that Mr. Clemmons shot the victim, and that they “were going to put it on someone else.” He also testified that Mr. Gaines stated that it was his idea to do the robbery.
The State presented the testimony of Vincent Gaines. Mr. Gaines was the look-out in this case. Mr. Gaines never, from the time of the murder to the evidentiary hearing, told anyone that the Defendant is innocent. Nor did Mr. Gaines tell anyone that he and Mr. Clemons committed this crime themselves. Mr. Gaines never told anyone at jail, at the juvenile facility, or at the adult facility, that he lied about the Defendant’s involvement in this case. Mr. Gaines also testified that he never told the Defendant’s investigator that he lied regarding the Defendant’s involvement. Mr. Gaines then recounted what he did tell to the investigator. Mr. Gaines stated that he told the truth during the trial. Mr. Gaines testified that no one from the State Attorney’s Office told him how to testify in his recent deposition or in the evidentiary hearing. Mr. Gaines has been convicted of four felonies. Mr. Gaines testified, that even if given full immunity, there is nothing he would change about his trial testimony.
As previously noted, this Court finds it completely implausible that Mr. Hogan, a fourteen-time convicted felon, would have information regarding the guilt of a death row inmate, and not tell anyone, including his own attorney, because it was not his “business,” but it somehow became his “business” over a decade later when questioned by the Defendant’s investigator. Moreover, assuming arguendo that Mr. Hogan’s testimony with regard to Mr. Gaines was credible, it still would not probably produce an acquittal on retrial. Mr. Gaines’ lack of character was already before the jury. Further, and most importantly, as explained supra, there was overwhelming evidence implicating the Defendant. Mr. Hogan’s purported impeachment of Mr. Gaines would not produce an acquittal on retrial in light of the evidence of the Defendant’s guilt. As such, the Defendant’s claim of newly discovered evidence with regard to Mr. Gaines is denied.
(Record citations and footnote omitted.)
This Court defers to a postconviction court’s findings of fact and credibility determinations so long as they are supported by competent, substantial evidence. Porter, 788 So.2d at 923. Here, the postconviction court carefully weighed the credibility of numerous witnesses who testified as to statements that they heard in 1993 and were attempting to recall in 2011, when the evidentiary hearing was held. Clemons, who was thirteen at the time of the crime, told the police from the beginning that he had accompanied Moore into the victim’s house, saw Moore attempt to steal items from the victim, and then witnessed Moore shoot the victim. Clemons testified consistently at trial and reaffirmed this sequence of events during the evidentiary hearing. The postconviction court found Clemons’ testimony to be very credible and consistent with numerous other prior statements that Clemons had made much closer in time to the murder.
The postconviction court likewise carefully weighed Hallback’s testimony and found it “completely incredible” and worthy of no weight, noting that while Hall-back was Moore’s cousin and allegedly heard Clemons admit that Moore was not even present when the crime occurred, Hallback had waited from 1993 until 2005 for Moore’s defense team to contact him, even though his cousin was on death row.
Likewise, the postconviction court carefully reviewed the other inmates’ testimo *733 ny, finding that two of the witnesses provided such vague testimony that their recollections were worth little. As to the remaining statements, the postconviction court noted the witnesses’ extensive criminal records and the inconsistency of their stories when the witnesses stated that although they allegedly heard another inmate confess to a crime while they were incarcerated, they did not even tell their own counsel, but then recalled these statements over a decade later when Moore’s counsel contacted them.
In order to be entitled to relief on a claim of newly discovered evidence, Moore must show that the evidence is “of such nature that it would probably produce an acquittal on retrial.” Mungin, 79 So.3d at 738 (emphasis added) (quoting Jones, 709 So.2d at 521). As the postconviction court’s factual findings are supported by competent, substantial evidence and because the court did not err as to its legal conclusions, we affirm the denial of relief.
During the evidentiary hearing, the inmates who testified were attempting to recall the exact words from conversations that occurred about eighteen years earlier while they were incarcerated as juveniles. The specific wording of those statements was crucial. Their testimony, however, was ambiguous and never indicated that Moore was not involved in the crime at all. Only one witness recalled the codefendants stating explicitly that Moore did not commit the murder — Moore’s cousin, Hallback. However, as the postconviction court aptly found, Hallback’s testimony lacked credibility, as he also testified that he had waited for over ten years to disclose this information, after Moore’s defense attorneys failed to follow up on their promise to get back in touch with him.
At trial, four witnesses were critical to Moore’s conviction. Both Clemons and Gaines testified that Moore committed the murder and testified in substantially similar manners regarding the story. In addition, Jackson testified that he knew both Moore and Parrish and that while they were incarcerated together, Moore admitted that he had to kill Parrish because Parrish knew him. When Jackson responded that Moore did not need to kill Parrish, Moore replied that he did not mean to kill him. Finally, Chris Shorter testified that Moore had also confessed to him on two occasions that he killed Parrish and asked Shorter to burn a bag of clothes for him. According to this confession, Moore said that he first shot Parrish in the chest, which caused Parrish to slump to the side, and then Moore shot him in the head. Moore stated that Little Carlos Clemons was with him, shaking and scared, until he ran out of the house. Moore then told Shorter that he set a law mower on fire in order to clean all the fingerprints away. Shorter told his mother about this conversation, and she called the police.
After reviewing the full record and all of the testimony presented, including the equivocal statements made during the evi-dentiary hearing pertaining to the codefen-dants’ alleged confessions, Moore has not shown that the newly discovered evidence is “of such nature that it would probably produce an acquittal on retrial.” Mungin, 79 So.3d at 738 (emphasis added) (quoting Jones, 709 So.2d at 521). Accordingly, we deny relief on this aspect of Moore’s claim.
B. Other Newly Discovered Evidence
In addition to the above allegations, Moore also asserts that he is entitled to relief based on the testimony of Wil-helmenia Moore, the defendant’s mother, who testified at the evidentiary hearing that after Moore was convicted, Shorter approached her at a neighborhood service Station and said, “I don’t mean no harm, but I had to do what I had to do because I *734 had to think about my children.” The postconviction court denied this claim, noting that Wilhelmenia Moore has an interest in the case and that defense counsel never called Shorter to testify during the evidentiary hearing, so his original trial testimony “remains uncontroverted.”
A review of the evidence does not provide support for postconviction relief. Nothing within Shorter’s alleged statement to Wilhelmenia Moore clearly indicated that his trial testimony was untruthful. In fact, he may have simply been explaining that he was required by subpoena to testify in the case and felt badly about being required to testify against his friend. Moreover, as the postconviction court noted, Wilhelmenia Moore had a personal motivation to testify in the evidentia-ry hearing, as the defendant is her son.
Finally, Moore briefly asserts that he is entitled to postconviction relief because trial witness Audra McCray allegedly stated that she was threatened with the loss of custody of her child. However, Moore did not support this claim in more detail or allege what portion of McCray’s trial testimony was not true. Moore failed to allege exactly who threatened McCray with the loss of custody of her child or how her testimony was inaccurate. In fact, it is possible that McCray was simply advised that she was required to appear in court to testify pursuant to a subpoena and that she faced legal consequences if she failed to appear and testify. The parameters of this claim are vague and unclear.
As this Court has held, a defendant is not automatically entitled to an evidentiary hearing but must allege specific facts, not conclusively refuted by the record, which demonstrate entitlement to relief. “A summary or conclusory allegation is insufficient to allow the trial court to examine the specific allegations against the record.” Ragsdale v. State, 720 So.2d 203, 207 (Fla.1998); see also Jones v. State, 845 So.2d 55, 64 (Fla.2003) (“Post-conviction relief cannot be based on speculative assertions.”); Freeman v. State, 761 So.2d 1055, 1061 (Fla.2000) (holding that “[t]he defendant bears the burden of establishing a prima facie case based upon a legally valid claim” and that conclusory allegations are not sufficient). Thus, we affirm the denial of relief.
CONCLUSION
Based on the above analysis, we affirm the denial of Moore’s second successive motion for postconviction relief.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

. To the extent that Moore asserts claim two involves Brady or Giglio violations, we reject these claims as insufficiently pled. To the extent that Moore is attempting to raise an ineffective assistance of counsel claim within this second successive postconviction motion, we affirm the postconviction court's ruling that such a claim is untimely.

. The postconviction court spelled Clemons' name as "Clemmons.”