# DISTRICT COURT OF APPEAL OF FLORIDA
## SECOND DISTRICT

_____

STATE OF FLORIDA,

Appellant,

v.

NATHAN McREYNOLDS,

Appellee.

No. 2D2023-1900

_____

January 22, 2025

Appeal from the Circuit Court for Hillsborough County; Barbara Twine Thomas, Judge.

Ashley Moody, Attorney General, Tallahassee, and Cerese Crawford Taylor, Assistant Attorney General, Tampa, for Appellant.

Deana K. Marshall of Law Office of Deana K. Marshall, PA, Riverview, for Appellee.

SMITH, Judge.

The State appeals from an order granting in part and denying in part Nathan McReynolds' motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850. Because Mr. McReynolds failed to show any prejudice as the result of trial counsel's failure to investigate and call Kathleen Farris as a witness at the Stand Your Ground hearing or at trial, we reverse the order insofar as it grants Mr.

McReynolds relief.  We affirm the order without comment in all other respects.

In 2008, Troy Absher was shot and killed.  Mr. McReynolds was charged with second-degree murder.  Mr. McReynolds filed a Stand Your Ground motion arguing that he pointed the gun at Mr. Absher as a means of self-defense and that he did not intentionally fire the gun.  The trial court denied his Stand Your Ground motion following an evidentiary hearing, and the matter proceeded to a jury trial.  Mr. McReynolds was found guilty of the lesser charge of manslaughter and sentenced to twenty-eight years in prison followed by two years' probation.  His conviction and sentence were affirmed on appeal.  *McReynolds v. State*, 53 So. 3d 1036 (Fla. 2d DCA 2011) (table decision).

Mr. McReynolds timely filed the operative amended motion for postconviction relief asserting claims of ineffective assistance of counsel.  An evidentiary hearing was held on certain claims while others were summarily denied by the postconviction court.  As is relevant to the State's appeal, the postconviction court granted claims one and two of the amended motion for postconviction relief, which alleged that counsel was ineffective for failing to investigate statements from Ms. Farris that would have supported the claim of self-defense, and that counsel was ineffective for failing to call Ms. Farris as a witness at both the Stand Your Ground hearing and at trial.

Mr. McReynolds' amended motion attached a letter from Ms. Farris.  The letter was treated as an affidavit and stated, in its entirety:

To whom it may concern:

My name is Kathleen Gaul Farris.  I am writing this letter in regards to Nathan McReynolds.  I wrote a letter 5yrs. ago and was told it was gonna be entered into court evidence,

2

in which it was never entered.[1]  I have concerns about Nathan and his frame of mind on the day of Oct. 5th.  Nathan came to my house for help.  He is like a son to me.  He is a very loving and giving person.  He would do whatever he could for his children and family and those he considered family.  He was a hard worker, and a loving caring father, son, friend.  Nathan was a very unstable, very emotional wreck that night.  When I let him into my house that night I couldn't get him to stop crying, he was on his knees prayed in Cuban to the picture of God and my granddaughter praying to be forgiven and that he didn't mean to shoot him.  I got him something to drink, sat him down, held on to him and let him cry.  It was an accident, Nathan is not the type of man to purposely shoot someone.  He had to have been scared for his kids and his pregnant girlfriend and their lives.  Then a few months after the shooting I was in a room where Mr. Chris Valdez was talking about how he had Troy talked into robbing Nathan that day.  Troy also was known to carry a gun.  I don't know how it all went down but I know that when Nathan came to my house it was so disturbing.  And after about 2 hours of trying to talk to Nathan all he could say was that if Troy died that Nathan would shoot himself and die.  It was so emotional and I got down on my knees with Nathan and prayed and I also prayed that Nathan would find the strength not to take his life, for the fact that it would not bring Troy back, and that his mother and children need him.  If I am needed to answer more questions feel free to call me.

At the evidentiary hearing Ms. Farris testified that she saw Mr. McReynolds in the afternoon of October 4, 2008, when he showed up at her mobile home crying hysterically.  Consistent with her affidavit, she testified that Mr. McReynolds, who did not appear intoxicated, was upset and hid under Ms. Farris' mobile home for hours until Mr. McReynolds' mother came to get him.

---

[1] There is no evidence in the record that would support the statement that Ms. Farris sent a letter to counsel prior to Mr. McReynolds' trial.

3

When asked if she knew the victim, Mr. Absher, Ms. Farris testified that she did not know him very well but that she had seen him with a gun. Ms. Farris gave confusing testimony regarding alleged threats made by Mr. Absher toward Mr. McReynolds. Ms. Farris' testimony regarding the threats was particularly important because Mr. McReynolds and his fiancée both testified at the Stand Your Ground hearing that they overheard a telephone conversation between Ms. Farris and Mr. Absher, during which Mr. Absher threatened Mr. McReynolds. One of the grounds alleged in the amended motion for postconviction relief was that counsel should have called Ms. Farris to corroborate this testimony. However, at the postconviction hearing, Ms. Farris' testimony was confusing and scattered. To be sure, the postconviction court commented: "Her testimony is not clear . . . . It doesn't make it very helpful to me. I have to tell you I can't rely on it." In her testimony, Ms. Farris recalled a time when she was talking on the phone to Mr. Absher and "there was threats made, but I'm not sure if it was on the phone. I mean I think it was in person, but there was a lot of threats made, yes." She also testified to a telephone conversation she had with Mr. Absher two weeks before the shooting. She testified that while the call was on speakerphone, Mr. McReynolds was not present. And two to three weeks before the shooting, she recalled that Mr. Absher threatened Mr. McReynolds in person.

Ms. Farris was also asked about the portion of her affidavit in which she swore that she overheard Chris Valdez bragging that he had talked Mr. Absher into robbing Mr. McReynolds on the day of the shooting. This testimony was important because Mr. McReynolds alleged in his amended motion for postconviction relief that counsel was ineffective for failing to call Ms. Farris as a witness for purposes of

4

impeaching Mr. Valdez.  Mr. Valdez testified at trial that he did not know that Mr. McReynolds was going to be home when he arranged to meet Mr. Absher at Mr. McReynolds' house.  But at the hearing Ms. Farris testified that she had never heard of Mr. Valdez, nor would she be able to identify him if she were to see him.  In fact, she was asked no less than four times on direct examination whether she knew Mr. Valdez—each time responding that she did not know the man.  And when asked if she recalled a conversation after the shooting about Mr. McReynolds and a possible robbery attempt, she testified that she heard that rumor; her response was stricken as hearsay.

On cross-examination, the State too asked Ms. Farris about the portion of her affidavit in which she stated that she was in a room with Mr. Valdez a few months after the shooting and that she heard him talking about how he had planned to rob Mr. McReynolds.  Ms. Farris responded that there were a lot of people in that room, including the victim, Mr. Absher.  However, Mr. Absher being in the room was an impossibility because this conversation supposedly happened months after the shooting and Mr. Absher was dead.  She again confirmed that she did not know Mr. Valdez, stating, "Back then, I was so messed up myself, I can't remember half of the people I knew."

The parties submitted written closing arguments.  The postconviction court rendered its order granting claims one and two finding that counsel was ineffective for failing to investigate Ms. Farris and for failing to call her as a witness at both the Stand Your Ground hearing and trial.

Claims of ineffective assistance of counsel ordinarily turn on questions of fact.  *See Barnett v. State*, 181 So. 3d 534, 536 (Fla. 1st DCA 2015).  We defer to those credibility determinations and factual findings

5

made by the postconviction court that are supported by competent substantial evidence. *Moore v. State*, 132 So. 3d 718, 727 (Fla. 2013); *see also Campbell v. State*, 247 So. 3d 102, 106 (Fla. 2d DCA 2018). "[W]e review de novo the court's legal conclusions." *Campbell*, 247 So. 3d at 106 (citing *Light v. State*, 796 So. 2d 610, 615 (Fla. 2d DCA 2001)).

A defendant asserting ineffective assistance of counsel must prove two elements. "First, the defendant must show that counsel's performance was deficient." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* To establish the first prong, the defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness" under "prevailing professional norms." *Id.* at 688. In establishing the second prong, the defendant is required to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also McQuitter v. State*, 103 So. 3d 277, 280 (Fla. 4th DCA 2012) ("The movant must show something more than a possibility 'that the errors had some conceivable effect on the outcome of the proceeding.' " (quoting *Strickland*, 466 U.S. at 693)).

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." The

6

likelihood of a different result must be substantial, not just
conceivable.

*Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (citations omitted).
Failure to satisfy either prong ends the *Strickland* inquiry. *See Preston v.
State*, 970 So. 2d 789, 803 (Fla. 2007) (citing *Ferrell v. State*, 918 So. 2d
163, 170 (Fla. 2005)).

We first address the postconviction court's findings related to Mr.
McReynolds' claim that counsel was ineffective for failing to call Ms.
Farris as a witness at both the Stand Your Ground hearing and at trial.

> In cases involving the failure to call witnesses, the prejudice
> prong of *Strickland* requires that the postconviction court
> consider the admissibility of the testimony; its weight as
> determined by whether it goes to the merits of the case, is
> cumulative, and is material and relevant; and any
> inconsistencies presented by it.

*Campbell*, 247 So. 3d at 108 (citing *Light*, 796 So. 2d at 617). "That is,
the [postconviction court] is not examining simply whether [it] believes
the evidence presented as opposed to contradictory evidence presented at
trial, but whether the nature of the evidence is such that a reasonable
jury may have believed it." *Lee v. State*, 899 So. 2d 348, 354-55 (Fla. 2d
DCA 2005) (quoting *Light*, 796 So. 2d at 617).

Here, the postconviction court found that had counsel properly
investigated Ms. Farris and called her as a witness, she would have
testified to the following:

1. That she overheard Mr. Valdez telling someone that he had
   talked Mr. Absher into robbing Mr. McReynolds on the day of
   the shooting.

2. That Mr. Absher called Ms. Farris on the phone, and she
   heard him make threats to Mr. McReynolds.

3. That Mr. Absher was known to carry a gun and Ms. Farris
   had previously seen him with a gun.

7

4. That Mr. McReynolds came to her house immediately after the shooting and Ms. Farris observed his hysterical demeanor.

Crucially here, the postconviction court acknowledged that Ms. Farris testified at the evidentiary hearing that she has never met Mr. Valdez, yet it relied upon the later testimony of Mr. McReynolds' mother and representations made by counsel for Mr. McReynolds that Ms. Farris only testified that she did not know Mr. Valdez out of fear. The postconviction court resolved this inconsistency by finding Ms. Farris' affidavit more credible than her testimony at the evidentiary hearing and relied upon the statements made therein. As authority for this resolution, the postconviction court cited to *State v. Corner*, 84 So. 3d 358 (Fla. 4th DCA 2012), for the proposition that a postconviction court is permitted to find a witness' affidavit more credible than subsequent evidentiary hearing testimony.

In *Corner*, the defendant had been convicted of attempted first-degree murder and second-degree murder stemming from a drive-by shooting in which the surviving victim was shot in the leg and the deceased victim suffered a fatal gunshot wound. *Id.* at 359. The only evidence connecting the defendant to the shooting was the surviving victim's identification of the defendant as the shooter. *Id.* The defendant filed a motion for postconviction relief arguing trial counsel was ineffective for failing to call two alibi witnesses. *Id.* The postconviction motion was amended to include an affidavit from the surviving victim recanting his identification of the defendant as the shooter. *Id.* Specifically, the victim swore in his affidavit that he did not actually see who shot him, but instead was relying on hearsay from people telling him it was the defendant who shot him. *Id.*

8

The postconviction court held an evidentiary hearing at which the defendant, the defendant's companion that night, two alibi witnesses, the 911 caller, and the surviving victim testified. *Id.* The alibi witnesses testified that they both saw the defendant's burgundy Bonneville parked and blocked in at a party on the night in question. *Id.* The defendant was showing off the car at the party. *Id.* The defendant's companion that night also testified that he and the defendant were at this party on the night in question. *Id.* at 360. The victim testified that the person who shot him was driving a burgundy Bonneville and attempted to recant the assertions contained in the affidavit. *Id.* But the 911 caller's testimony belied this where the recording revealed the victim initially said the car involved was white. *Id.* The postconviction court granted the motion for postconviction relief. *Id.* at 361.

On appeal, the Fourth District held:

> Because the surviving victim's identification was the "only evidence implicating [the defendant]," an admission that he did not actually see the shooter would be both highly material and relevant. Further, the testimony of the other witnesses corroborated the affidavit, not the surviving victim's testimony. And the trial court explicitly found the affidavit more credible than his testimony. Along with other corroborating testimony, the court found the affidavit sufficient to weaken the case against the defendant and create reasonable doubt. Under the unique circumstances of this case, we affirm.

*Id.* at 362 (alteration in original).

Conversely here, there was nothing in Ms. Farris' affidavit that could be considered "highly material and relevant." *See id.* Nor was there any testimony offered that would corroborate Ms. Farris' affidavit or testimony. Ms. Farris' affidavit merely provides that Mr. McReynolds was a loving person who would do anything for his family. It states that Mr. McReynolds came to Ms. Farris' house that night, was very emotional,

9

was praying for forgiveness, and told Ms. Farris that he did not mean to shoot Mr. Absher. The affidavit provides that "a few months" after the shooting Ms. Farris was in a room where Mr. Valdez was talking about how he had talked Mr. Absher into robbing Mr. McReynolds. The affidavit also states that Mr. Absher "was known to carry a gun." The affidavit is silent as to whether Mr. McReynolds knew of either of those things. The affidavit also does not address the phone call, overheard by Mr. McReynolds and his fiancée, where Mr. Absher allegedly threatened Mr. McReynolds. Contrary to the facts in *Corner,* there is nothing in the affidavit that could be considered "highly material and relevant." Accordingly, on this issue the postconviction court erred in relying upon this information in Ms. Farris' affidavit over her testimony at the hearing.

We next address the facts the postconviction court found that Ms. Farris would have testified to had defense counsel investigated Ms. Farris and called her as a witness.

The robbery conversation

The postconviction court found that Ms. Farris' testimony that she overheard Mr. Valdez telling someone that he talked Mr. Absher into going to Mr. McReynolds' house on the day of the shooting to rob Mr. McReynolds would have been admissible to impeach Mr. Valdez's testimony at trial. Specifically, Mr. Valdez testified at trial that he did not think Mr. McReynolds would be home when he got there and that he did not plan with Mr. Absher to take Mr. McReynolds by surprise. The postconviction court also found that this testimony would support a finding that Mr. McReynolds' fear was reasonable at the time of the shooting.

However, in its consideration of the prejudice prong the postconviction court fell short of the required analysis in *Strickland* as we

10

laid out in our decision in *Campbell*. *See Campbell*, 247 So. 3d at 108. The postconviction court did consider the admissibility of the testimony, finding that it would have been admitted to impeach Mr. Valdez's testimony that he did not think Mr. McReynolds would be home. However, the postconviction court overlooked consideration of that testimony's weight—whether it goes to the merits of the case, is cumulative, and is material and relevant—and, significantly in this case, any inconsistencies. *See id.*

Ms. Farris' testimony regarding the rumor or conversation she overheard about Mr. Valdez and Mr. Absher's plan to rob Mr. McReynolds the night of the shooting is classic hearsay. And even though the postconviction court found this hearsay testimony would have been admissible to impeach Mr. Valdez's testimony that he did not believe Mr. McReynolds would be home, such hearsay testimony admitted for impeachment cannot be used as substantive evidence. *See Ellis v. State*, 622 So. 2d 991, 996-97 (Fla. 1993) (holding that a prior statement used for the substantive effect of its truthfulness is "therefore inadmissible in the absence of any other exception to or exclusion from the hearsay rule"). In fact, with regard to calling Ms. Farris at trial, the postconviction court expressly found that "Mr. Valdez specifically testified at trial that he did not bring Mr. Absher to [Mr. McReynolds'] house in an effort to intimidate him[.] Ms. Farris' testimony impeaching Mr. Valdez's credibility would have been significant to establish the reasonableness of [Mr. McReynolds'] fear of both men in the moment." This is precisely the type of hearsay testimony addressed by the court in *Ellis*: the jury is not permitted to consider this hearsay evidence to establish the substantive fact that Mr. McReynolds was in fear at the time of the shooting. *See id.* Moreover, if the testimony is being used to

11

impeach Mr. Valdez's credibility, it cannot be evidence that affects the merits of the case, nor can it be material in proving either the State's case or the claim of self-defense. The hearsay statement can only be used as impeachment evidence to call into question Mr. Valdez's credibility. Therefore, there is no reasonable probability that Ms. Farris' testimony regarding the alleged robbery plan would have changed the outcome of either the Stand Your Ground hearing or the trial.

The threatening phone call

The postconviction court also found that Ms. Farris' testimony regarding the phone call from Mr. Absher would have corroborated the testimony of Mr. McReynolds and his fiancée at the Stand Your Ground hearing. This factual finding is not supported by competent substantial evidence where Ms. Farris' affidavit did not state anything about the threatening phone call and her testimony at the postconviction hearing contradicted the prior testimony of Mr. McReynolds and his fiancée at the Stand Your Ground hearing. Ms. Farris testified that the threats were made in person, whereas Mr. McReynolds and his fiancée both testified at the Stand Your Ground hearing that they overheard a phone conversation whereby Mr. Absher threatened Mr. McReynolds. *See Sandoval v. State*, 225 So. 3d 962, 963 (Fla. 3d DCA 2017) (holding that the postconviction court properly considered the inconsistency in the witnesses' statements when finding the testimony incredible). Furthermore, any testimony from Ms. Farris regarding the threat would have been cumulative and counsel cannot be deemed ineffective for failing to present cumulative evidence. *See Covington v. State*, 348 So. 3d 456, 471 (Fla. 2022) ("[E]ven if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present

12

cumulative evidence." (quoting *Wheeler v. State,* 124 So. 3d 865, 881 (Fla. 2013))).

In addressing the trial, the postconviction court found that trial counsel did not present any evidence of the phone call between Ms. Farris and Mr. Absher and that this evidence—that Mr. Absher had recently threatened Mr. McReynolds and that Mr. McReynolds was aware of the threat—would have established that Mr. McReynolds was in fear when he saw Mr. Absher at his home.

As an initial matter, trial counsel's strategic decision not to introduce testimony regarding the threatening phone call was not a claim raised by Mr. McReynolds in his amended postconviction motion. Moreover, trial counsel testified at the evidentiary hearing that during the Stand Your Ground hearing, after Mr. McReynolds and his fiancée testified as to the threatening phone call, the State impeached Mr. McReynolds using his police interview. Specifically, Mr. McReynolds had to admit that he did not mention the telephone threats to the police during his interview and that, in fact, he repeatedly told the officers that he was <u>not</u> afraid of Mr. Absher.[2] The evidence presented at the hearing only supports the finding that counsel's decision not to introduce evidence related to the alleged threatening phone call was strategic and did not constitute ineffective assistance of counsel. *See Derrick v. State,* 983 So. 2d 443, 461 (Fla. 2008) ("[S]trategic decisions do not constitute

---

[2] Mr. McReynolds agreed to an interview with police after receiving his *Miranda* warnings. *See Miranda v. Arizona,* 384 U.S. 436 (1966). During his interview, Mr. McReynolds recalled his relationship with Mr. Absher, which included a fist fight. Mr. McReynolds told the officers: "How am I gonna shoot somebody that I whooped their ass in three seconds. I wasn't intimidated. I wasn't scared enough to where, 'Fuck this guy is gonna beat me up.' " Mr. McReynolds reiterated that he was not intimidated by Mr. Absher who "fought like a girl."

ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." (alteration in original) (quoting *Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000))).

<u>Mr. Absher was known to carry a gun</u>

The postconviction court found that Ms. Farris' testimony that Mr. Absher was known to carry a gun would have supported Mr. McReynolds' theory that Mr. McReynolds was reasonably in fear of imminent deadly force at the time of the shooting.

With regard to the impact of this testimony at trial, the postconviction court found that "the effect of her testimony would have been to cause doubt on the State's theory that [Mr. McReynolds] was merely angry that Mr. Valdez and Mr. Absher [were] on his property and to support the defense theory that Mr. Absher and Mr. Valdez's actions were objectively threatening." This finding is also flawed because the evidence that Ms. Farris, not Mr. McReynolds, knew Mr. Absher to carry a gun and had seen him with a gun at some point would not be admissible and trial counsel cannot be deemed ineffective for failing to introduce inadmissible evidence. Evidence of a homicide victim's reputation for carrying a firearm is not admissible to prove that the defendant's fear of the victim was reasonable as to support a defendant's self-defense claim unless the defendant can show that he had knowledge of the victim's reputation for carrying a gun. *See Munoz v. State*, 45 So. 3d 954, 958-59 (Fla. 3d DCA 2010). Here, there was no evidence that Mr. McReynolds knew that Mr. Absher was known to carry a gun, only that Ms. Farris knew Mr. Absher to carry a gun; therefore, this testimony would not have been admissible to show Mr. McReynolds' state of mind at the time of the shooting. There was no evidence that Mr. McReynolds

14

knew of this information, especially considering Mr. McReynolds' statements to law enforcement that he was not afraid of Mr. Absher at the time of the shooting, and this testimony would not have changed the outcome of either the Stand Your Ground hearing or the trial.

Mr. McReynolds' state of mind following the shooting

The postconviction court only considered the evidence that Mr. McReynolds was hysterical when he arrived at Ms. Farris' house in relation to the Stand Your Ground hearing; the order does not rely on or mention this testimony in relation to the claim that counsel was ineffective for failing to call Ms. Farris as a witness at trial. As to the Stand Your Ground hearing, the postconviction court found that Ms. Farris' testimony regarding Mr. McReynolds' hysterical demeanor when he arrived at her home would have corroborated Mr. McReynolds' explanation for inconsistencies between his direct testimony and his recorded interview with law enforcement. But Mr. McReynolds' demeanor when he arrived at Ms. Farris' house, more than twelve hours before he was interviewed by police, would not explain any inconsistencies between Mr. McReynolds' interview and his testimony at the Stand Your Ground hearing. In the same way, this testimony would also not be likely to change the outcome of the Stand Your Ground hearing.

Failure to investigate

If there was no Sixth Amendment violation as the result of counsel's failure to call Ms. Farris as a witness, then it follows that there can be no violation for failing to investigate Ms. Farris. It is well settled that for a defendant to establish a Sixth Amendment violation based on counsel's allegedly inadequate performance, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the

15

result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (explaining that even if counsel was deficient for failing to investigate, the defendant must still establish that counsel's actions prejudiced his defense). Here, even if counsel had investigated and interviewed Ms. Farris, as explained above, her testimony would not have changed the outcome of the proceedings.

Accordingly, because Mr. McReynolds failed to show any prejudice as the result of trial counsel's failure to investigate and call Ms. Farris as a witness at the Stand Your Ground hearing or at trial, we reverse the portion of the postconviction court's order granting Mr. McReynolds' requested relief. Finding no error in the postconviction court's denial of the remaining claims raised in the amended motion for postconviction relief, we remand with instructions that Mr. McReynolds' conviction and sentence for manslaughter be reinstated.

Affirmed in part, reversed in part, and remanded with instructions.

ROTHSTEIN-YOUAKIM and LABRIT, JJ., Concur.

_____

Opinion subject to revision prior to official publication.